HOBART J. HENDRICK AND MARY B. HENDRICK, PETITIONERS, *v*. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 81690.   Filed March 31, 1961.

---

*Grant N. Nickerson, Esq.*, for the petitioners.
*Douglas D. Robertson, Esq.*, for the respondent.

Scott, *Judge:* Respondent determined deficiencies in the income tax of petitioners for the years 1954, 1955, 1956, and 1957 in the amounts of $1,433.71, $941.67, $394.29, and $3,557.05, respectively.

The issues for decision are:

(1) The amounts of deductions for depreciation to which petitioners are entitled for the years 1954, 1955, 1956, and 1957 with respect to certain rental property owned by them;

(2) Whether petitioners are entitled to a deduction for legal fees paid by them in the taxable year 1954;

(3) Whether petitioners are entitled to a deduction for an appraisal fee paid by them in the taxable year 1956; and

(4) Whether petitioners are entitled to deduct as medical expenses the amounts paid by them as the cost of their son's attending the Hampshire Country School.

Each of the parties has conceded certain issues raised by the pleadings.

### FINDINGS OF FACT.

Some of the facts have been stipulated and are found accordingly.

Petitioners are husband and wife who resided during all of the years here involved at 136 Blake Road, Hamden, Connecticut. They filed joint income tax returns for the taxable years 1954, 1955, 1956, and 1957 with the district director of internal revenue at Hartford, Connecticut.

### *Issue 1.*

Petitioners purchased the improved real estate located at 136 Blake Road, Hamden, Connecticut, in November 1944 for $18,123. During the year 1951 petitioners converted the property into a two-family house. This conversion consisted of making one wing of the house

into an apartment completely separate from the other part of the house. The apartment had its own front door and back door, and a stairway to the second floor and down to the basement. The total amount expended by petitioners in 1951 in the conversion of the property into a two-family house was $8,402.81. All of this amount was classified by petitioners as renovation expenses except for $158 paid as an architect's fee and $9.82 and $60.89 designated as expended for hardware and fixtures, respectively. On June 25, 1952, petitioners spent $47.50 for outlets for the apartment, and on August 20, 1953, petitioners purchased a refrigerator and stove at a total cost of $300 which they listed under the cost of apartment conversion. In addition to the amount expended by petitioners in converting the house into a two-family house, petitioners, subsequent to the purchase of the property, expended the following amounts on the dates and for the purposes indicated:

| Date | Purpose | Amount |
|---|---|---|
| Aug. 20, 1945 | Walls and sidewalks | $572.26 |
| Sept. 11, 1945 | New water heater (second hand) | 435.00 |
| July 5, 1946 | Painting | 796.30 |
| Dec. 20, 1950 | New sink | 349.95 |
| Nov. 24, 1951 | Incinerator | 15.30 |
| May 6, 1952 | New oil burner | 715.40 |
| June 2, 1952 | New parking area | 313.50 |
| Dec. 10, 1953 | Entrance light | 41.87 |
| | | 3,239.58 |

The house at 136 Blake Road originally consisted of 12 rooms. Four of the original rooms were located in the wing which was converted in 1951 into the separate apartment and the eight remaining rooms were in the main portion of the house. However, prior to the conversion of the wing into an apartment, two of the original rooms had been made into one very large room to be used as a rumpus room. When the wing was converted to an apartment this room was left as one large room so that the apartment consisted of three rooms.

Petitioners on their income tax returns claimed a depreciation rate of 3 percent, a total depreciation in each of the years of $593.56, and a basis for depreciation of $15,871.17, computed as follows:

| | |
|---|---|
| Original cost of the entire property | $18,123.00 |
| Improvements to entire property | 3,239.58 |
| Total | 21,362.58 |
| Allocated to rented portion | 7,120.86 |
| Direct cost of conversion | 8,750.31 |
| | 15,871.17 |

On brief they claimed a basis of depreciation of $15,263.50, computed as follows:

| | |
|---|---:|
| Original cost of the entire property | $18,123.00 |
| Less portion allocable to land | 1,823.00 |
| | 16,300.00 |
| Improvements to entire property | 3,239.58 |
| | 19,539.58 |
| Allocable to rented portion (one-third) | 6,513.19 |
| Direct cost of conversion | 8,750.31 |
| | 15,263.50 |

Respondent in his notice of deficiency allowed a basis for depreciation of $6,698.39 computed as follows:

| | | |
|---|---:|---:|
| Building basis | | $15,600.00 |
| Improvements claimed | $3,239.58 | |
| Less painting (repairs) | 796.30 | 2,443.28 |
| Additional improvements | | 8,750.31 |
| Cost basis | | 26,793.59 |

¼ rental=$6,698.39; 12 rooms—3 rented
Depreciation $6,698.39 × 3%=$200.95

Respondent allowed the amount of $200.95 as depreciation in each of the years 1954, 1955, 1956, and 1957.

As of November 20, 1944, the property at 136 Blake Street was assessed by the town of Hamden, Connecticut, for real estate taxes at a total value of $23,660 of which $2,460 was allocated to land and $21,200 to buildings.

Shortly after the conversion of the property, it was rented to a couple who soon after renting the property became separated. The wife continued to occupy the property until late in the year 1953 but petitioners did not collect the rent. Thereafter and throughout the years here involved, the property was continuously rented to persons who paid the rental charge therefor to petitioners.

*Issues 2 and 3.*

Amelia J. Ives was the stepgrandmother of Hobart J. Hendrick, hereinafter referred to as petitioner. Amelia J. Ives died on July 6, 1952, in Quincy, Illinois, leaving as her only heir at law a sister, Kate Jansen. Kate Jansen was appointed administratrix of the estate of Amelia J. Ives.

In early December 1952, petitioner received a letter from a bank at Quincy, Illinois, requesting him to come to Quincy, Illinois. Petitioner and his brother immediately went out to Quincy, Illinois, and someone in the trust department of the bank took them to see an attorney who showed them a copy of a will which purported to be a copy of a will made by Amelia J. Ives. The copy of the will which

was shown to petitioner provided that one twenty-fifth of the estate be distributed to her sister, Kate Jansen, and the remainder of the estate be distributed one-third to petitioner and one-third each to petitioner's brother and cousin.

The lawyer who drew up the will of Amelia J. Ives told petitioner that at the time he drew up the will he had instructed Amelia to go to the bank and to see the president of the bank and deposit the will in her safe-deposit box. Petitioner was given other information which led him to believe that the will, a copy of which he had been shown, had not been revoked by Amelia J. Ives prior to her death. Petitioner and his brother and cousin employed the law firm of Schmiedeskamp & Jenkins to attempt to have the copy of the will probated. The original will was never located. A settlement was arrived at on January 14, 1953, between Kate Jansen and the three other beneficiaries under the will whereby the copy of the will was admitted to probate and Kate Jansen received the income from the entire estate for her lifetime. A trust company was named as executor of the estate of Amelia J. Ives and the same attorneys who had been the attorneys for Kate Jansen while she was administratrix of the estate continued to act as attorneys for the executor.

Kate Jansen died on August 15, 1955, and thereafter one-third of twenty-four twenty-fifths of the estate of Amelia J. Ives was distributed to petitioner.

In the year 1954 petitioner paid the amount of $4,900 to the firm of Schmiedeskamp & Jenkins, which amount was one-third of the total fee charged by that law firm for legal services rendered to petitioner, his brother, and his cousin, resulting in the agreement to allow the copy of the will to be admitted to probate. In the same year petitioner paid the amount of $1,767 to the same law firm which represented one-third of the total fee charged to petitioner, his brother, and his cousin for legal services rendered after the probate of the will. The statement of services rendered for which the fee of $1,767 was paid by petitioner contained the following explanation:

To services rendered and expenses incurred from January 12, 1953 to date in connection with the handling, managing and safeguarding of your interest in the Estate of Amelia J. Ives, deceased, her last will and testament having been admitted to probate in the County Court of Adams County, Illinois on January 12, 1953, and consisting of investigations and determinations as to the selection of securities to be liquidated, the examination and review of proposed Federal estate tax and state inheritance tax returns by the Executor, checking on the progress of the administration in the estate and extensive correspondence to advise you of actions being taken by the executor, negotiations and drafting of trust deeds and agency agreements for the protection and safeguarding of the assets of the estate of Amelia J. Ives during the pendency of the life estate therein of Kate E. Jansen   $1,767.00

On their income tax return for the year 1954 petitioners claimed a deduction of $1,767 for legal fees paid, which deduction was dis-

allowed by respondent. In their petition, petitioners claimed an additional deduction for legal fees in the amount of $4,900.

One of the assets which, under the will of Amelia J. Ives, was distributable equally to petitioner, petitioner's brother, and his cousin was a note secured by a mortgage deed. The original note secured by the mortgage had been approximately $84,000 and at the time the estate of Amelia J. Ives was being distributed the amounts paid thereon had reduced the note to approximately $50,000. Instead of attempting to divide the note among themselves, the beneficiaries borrowed the amount remaining unpaid on the note from a bank, pledging as collateral the note and mortgage deed. Repayment of the note of the beneficiaries to the bank was to be made by application of the payments on the original note which was secured by the mortgage. Prior to agreeing to make the loan the bank required that an appraisal be made of the mortgaged property. The appraisal fee was $198.30, and petitioner, in 1956, paid one-third of the total appraisal fee. On their income tax return for the year 1956 petitioners deducted $66.10, the portion of the appraisal fee paid by them, and respondent in the notice of deficiency disallowed this deduction.

## Issue 4.

Hobart J. Hendrick, Jr. (generally referred to by the witnesses in this proceeding as "Skip" and hereinafter so referred to), is petitioners' adopted son. During the year 1957 he was 15 years old. When Skip was 3 years old he had been enrolled by his parents in a nursery school from which he was dismissed after 2 weeks' attendance. He was placed in another nursery school and was again dismissed after attending for a few weeks. The following year he attended nursery school at the Hamden Hall Country Day School in New Haven where he remained through kindergarten. His parents were requested not to enter him in the first grade at that school so they placed him in the first grade in a public school in Hamden, Connecticut. He attended the public school in Hamden, Connecticut, for a year or two, when because of problems he was having at home, his parents sent him away to the Fairside School in eastern Connecticut. He remained at Fairside School 2 or 3 years after which he was again admitted to Hamden Hall Country Day School. It was necessary while he was at Hamden Hall Day School during this period to have a private tutor with him. Before the end of his third year in Hamden Hall Day School he was taken out and sent to a private school in New Hampshire which was below the high school level where he completed that school year. He returned to the same private school the following fall and was requested to leave at Christmas time. Petitioners then placed Skip in Avon School outside of Hartford, Connecticut.

After Skip had been at the Avon School for a short while, his parents were informed that he would be permitted to stay at the school only if he had psychiatric help. Skip was taken to a doctor in New Haven named Emery who advised petitioners to place Skip the following year in Hampshire Country School, Timbertop, East Rindge, New Hampshire. Prior to the psychiatric treatment received by Skip which culminated in the advice to place him in Hampshire Country School he had seen other psychiatrists. The first psychiatrist whom he saw was a doctor named Healy who was the founder of the Judge Baker Foundation in Boston, Massachusetts, and it was this doctor who recommended that he be sent to the Fairside School. While Skip was at Hamden Hall, at the request of the school, he saw two different psychiatrists.

Skip entered the Hampshire Country School in the fall of 1956 and remained there approximately 2 years. After 2 years at Hampshire Country School, Skip entered the junior class at a private college preparatory school from which he graduated in June 1960. The cost per year for Skip's attendance at that school for tuition, room, and board was $2,200. Skip was 14 years and 7 months old upon entering Hampshire Country School and 16 years and 4 months old when he left that school.

The Hampshire Country School is for gifted children who are emotionally disturbed. The director of the school is Henry C. Patey who is a psychologist. Patey is a fellow in the American Psychological Association and Psychiatric Association. He entered the field of psychology after training at Columbia University and as researcher to the National Committee for Mental Hygiene on the mental health emphasis in education. He has been chief psychologist at the Brooklyn Child Guidance Center, Brooklyn, New York, and at the Delaware State Hospital and Mental Hygiene Clinic, and a psychologist to the Cambridge-Somerville Youth Study under the Talbot Foundation in Cambridge. He has been a research psychologist to the Grant Study at Harvard University and to the Glueck Study at Harvard Law School, and chief psychologist at the Judge Baker Guidance Center and at the Boston Juvenile Court Citizens' Training Department. He has been associated with agencies in Wellesley and has been in private practice. While in private practice at Wellesley he took children into his home for residential therapy. He was so engaged at the time he moved to New Hampshire in 1947 and began operating the Hampshire Country School. The confidential brochure to parents and counselors put out by the Hampshire Country School states:

First of all, we take only children whom we estimate to be of superior endowment. We specialize in eliminating, reducing, or rechanneling emotional energies which now are handicaps. We are most concerned with those who are

overly sensitive, academically blocked, or emotionally immature, and with those who are withdrawing from normal social life.

We are not equipped to handle aggressive delinquents or children who are ha[n]dicapped with neurological problems or psychoses. The overt problems of these children are too disturbing to our children. Further, the presence of such children would force us to introduce controls which are too drastic to be therapeutic for the super-sensitive children whom we admit. Only low pressure disciplines are appropriate here.

The Hampshire Country School admits children between the ages of 11 and 15 years, but after a child has been admitted he may continue at the Hampshire Country School through high school. The number of children in attendance at the Hampshire Country School varies between 18 and 26, and the staff of the school varies between 15 and 22. The regular faculty of the school have had education in psychology and guidance and in addition have had intensive in-service training under the school's consulting psychiatric social worker. Of the personnel of the school listed in a publication of the school entitled, "Timbertopics" under date of October 25, 1957, there were three consulting psychologists listed, one other psychologist, and a psychiatrist, J. Kendall Wallis, M.D., in addition to the director, Henry Curtis Patey, who was listed as a resident psychologist. The remainder of the staff had listed after their names specific subjects which they taught such as chemistry, English, or mathematics, except for those who were listed as the secretary, the nurse, and as doing housekeeping or cooking. A number of the persons listed, including the person listed as nurse, were also listed as houseparents.

The children at the school are at all times under the supervision of a qualified psychiatrist or psychologist. They have consultations with the school director, the social worker, or a person engaged in guidance activities throughout the week and have individual psychotherapy with the psychiatrist or with a caseworker usually once a week. The emphasis is not on individual psychotherapy but on residential therapy which consists of an attempt to handle the entire personal relationship of the child and the staff of the school in such a way that the child will receive value therefrom.

J. Kendall Wallis, a doctor who is listed in the school's list of personnel as the school's psychiatrist, visits the school regularly once a week and frequently the school director takes individual children to his office. He occasionally visits the school when an emergency arises at times other than his regular weekly visits. The psychiatric caseworker who works with the children is under the general direction and supervision of the psychiatrist. The services rendered to the children at the school by the psychiatrist, the psychologists, and the psychiatric caseworker who works regularly with the school are all included in the fees paid to the school. These fees also include the room and board and educational instruction the children receive.

Any individual psychiatric treatments the children receive away from the school are not included in the fees paid to the school.

The children at the school receive regular educational instruction at the level that they are able to work irrespective of age. Many of the children are academically several years below the level that they should have attained for their chronological age when they come to the Hampshire Country School. These children are given individual help and tutoring and in many instances they are able to accomplish the equivalent of 2 to 2½ years' work judged on a regular academic basis in a year or less. A brochure of the school entitled, "A Message to Prospective Students Seeking The Way to Find a Way from Henry C. Patey" states, in part, as follows:

No matter how poorly you may have been doing, we undertake to help you while you work and play for a couple of years. At first, while you look us over, we learn about you. We test your abilities, hear about your interests and spot any gaps in your educational development.

As you can well imagine, there is no single program that everyone follows—except for the essentials of an education. There is lee-way for each one to have his own program which he or she works out with the staff and changes as desired.

When a child is entered in the Hampshire Country School, an understanding is reached with the parents that visits to the school will be made only at such times as the school feels it is to the welfare of the child to have the parents visit. During the first year in the school the child is usually at the school all but 20 days of the calendar year. The 20 days of visitation outside the school with the parents is usually broken into several short visits. After the first year the time spent with the parents away from the school is increased.

When Skip first went to the Hampshire Country School he looked much younger than his chronological age. He was a very insecure boy and made efforts to conceal his insecurity by wearing cowboy gear such as broad-brimmed hats and wooden pistols. He was unable to concentrate his attention on classwork or any other projects for periods of more than 10 or 15 minutes at a time. He was able to learn very rapidly in the short periods of time during which he could concentrate. He created difficulties in any social group because he was hyperactive and insecure. Patey classified him as insecure and infantile in his development. In accordance with the usual practice of the school of having a statement from a psychiatrist and a psychologist in connection with any prospective student, the school received an analysis of Skip from both a psychiatrist and psychologist before he was accepted in the school. While Skip was at the Hampshire Country School he received the psychiatric and psychological, as well as the educational services, usually received by the children attending the school.

Most of the children entering the Hampshire Country School have had some previous formal education and most of the children after leaving the school continue their formal education. Some of the children continue at the Hampshire Country School until they graduate from high school under which circumstance the Hampshire Country School graduates the child at the high school level.

On their income tax return for the year 1957 petitioners claimed total medical expenses in the amount of $7,545.30. Included in the amount of medical expenses claimed was the amount of $6,270 paid by petitioners in the year 1957, on behalf of their son, to the Hampshire Country School.

Respondent in the notice of deficiency disallowed medical expenses in the amount of $6,223.70, computed as follows:

| | |
|---|---:|
| Total medical expenses claimed | $7,545.30 |
| School expenses disallowed | 6,270.00 |
| Balance | 1,275.30 |
| Adjusted gross income limitation | 1,322.23 |
| Allowable expenses | None |
| Claimed per return | 6,223.07 |
| Adjustment | 6,223.07 |

with the explanation, "Expenses of taxpayer's son while attending the Hampshire Country School are disallowed as medical expenses as attendance at the school is not principally for the alleviation of mental or physical condition but rather for disciplinary purposes."

OPINION.

### Issue 1.

The entire difference now existing between the parties as to the amount of depreciation deductible by petitioner in each of the years 1954 through 1957 is the proper basis of the rental portion of the property for the purpose of determining depreciation.

Petitioner now concedes that a portion of the original cost of the property at 136 Blake Street should be allocated to the land which is not subject to depreciation. Petitioner contends that the amount so allocated should be $1,823 of the original $18,123 cost of the property. He computes this amount on the ratio of the assessed value of the land as compared to the assessed value of the buildings by the town of Hamden, Connecticut, on November 20, 1944. Where the assessment is as of the time that the allocation is being made, it might in the absence of other evidence be used as a basis for allocation. Cf. *J. S. Cullinan*, 5 B.T.A. 996 (1927). In the instant case, however, the property was purely residential property when acquired by petitioner

in 1944 and a portion of it was not converted to business property before 1951. It is well settled that where nonbusiness property is converted to business property, the basis for depreciation is the fair market value at the time of the conversion or its adjusted cost basis whichever is less. *Parsons v. United States*, 227 F. 2d 437 (C.A. 3, 1955), and cases therein cited. In the instant case there is no showing of what relationship, if any, the assessed values as of November 20, 1944, as apportioned to the land and building, had to the fair market value of each in 1951 or 1954 whichever might be considered the date when a portion of the property was converted to business purposes. In fact the record is barren of any evidence of fair market value of the property in 1951 or 1954. Because of the failure of proof by petitioner to the contrary, we accept the determination of the building's basis of $15,600 as made by respondent.

Petitioner testified that the total expenditures on the property from the time of its acquisition through 1953, other than the amounts he considered to constitute apartment conversion, were $3,239.58. Of this amount $796.30 was designated as painting and petitioner offered no explanation as to why the expenditure on July 5, 1946, of $796.30 for painting did not constitute a repair as determined by respondent instead of an improvement. Absent proof that respondent's determination in this regard is in error we sustain respondent's determination.

The final item which is contested is the amount of $8,750.31 which petitioner testified had been compiled by him from invoices and checkbooks as representing the cost of the apartment conversion, and respondent listed as additional improvements to be added to the total basis of the property before allocation of the basis to the portion of the property rented. The major portion of the items listed by petitioner as apartment conversion is merely designated "renovation." There is no evidence showing that the amounts expended for renovation when the property was being converted into a two-family dwelling or any of the other expenditures except for $47.50 made in 1952 for outlets in the apartment were not equally applicable to the main building as to the apartment. The evidence fails totally to show what use was made of the refrigerator and stove purchased in 1953. Certainly, in converting what previously had been a one-family house into a two-family unit, it could not be presumed without proof that no portion of the expenditure was connected with the part which remained the main portion of the house and was occupied by petitioner and his family as a residence. Because of petitioner's failure to establish that any specific portion of the expenditures, made when the property which had been a one-family dwelling was converted into a two-family dwelling, applied solely to the apartment which was rented as distinguished from applying to the whole property (with the possible exception of the $47.50 spent for outlets for the apartment which

is too minor to warrant separate handling), we sustain respondent's addition of the total amount of the improvements to the basis of the total property. Cf. *Hannibal Missouri Land Co.*, 9 B.T.A. 1072 (1928). Respondent, on brief, concedes that one-third of the basis of the property as determined by him of $26,793.59 is applicable to the portion of the property which was rented in lieu of the one-fourth as determined in the notice of deficiency. We, therefore, hold that the basis for depreciation for the rental portion of petitioner's property is $8,931.19. The parties are in agreement that the depreciation rate is 3 percent.

### Issues 2 and 3.

Petitioner contends that the total amount of attorneys fees of $6,667 paid by him in 1954 is deductible from gross income as non-trade or business expenses under section 212 of the Internal Revenue Code of 1954. Of the amount paid $4,900 represented fees paid by petitioner for services of attorneys in effecting a settlement whereby a copy of a will of petitioner's stepgrandmother was admitted to probate where the original will could not be located. It was through the probate of this will that petitioner became entitled to a one-third distributive share of twenty-four twenty-fifths of his step-grandmother's estate. Prior to the probate of the will the sole heir at law of petitioner's stepgrandmother had been appointed as administratrix of the estate of his stepgrandmother and was proceeding to administer the estate on the assumption that petitioner's step-grandmother had died intestate. These facts show clearly that the fees paid to the attorneys which resulted in the settlement whereby the will was admitted to probate with the understanding that the heir at law of petitioner's stepgrandmother would have a life interest in the estate were amounts paid to acquire title to property. Such expenditures are not deductible as nontrade or business expenses under section 212 of the Internal Revenue Code of 1954. *Bowers* v. *Lumpkin*, 140 F. 2d 927 (C.A. 4, 1944), and *Daniel S. W. Kelly*, 23 T.C. 682, affd. 228 F. 2d 512 (C.A. 7, 1956). Cf. *James C. Coughlin*, 3 T.C. 420 (1944).

The amount of $1,767 was paid by petitioner for services of the attorneys in representing petitioner with respect to the estate while pursuant to the agreement when the will was admitted to probate the heir at law of his stepgrandmother had a life interest therein. The prime responsibility with respect to the estate was in the hands of the executor trust company and its attorney as respondent contends. Nevertheless, under the unusual facts here present, fees paid to an attorney to keep petitioner advised as to the handling of the corpus of the estate were ordinary and necessary expenses. It is true that petitioner, in the taxable year 1954, did not receive any income from this property. However, the interest which petitioner held in the prop-

erty subject to the income therefrom being paid to another for life was property held by the petitioner for the production of income within the meaning of section 212(2) of the Internal Revenue Code of 1954. It is not necessary that the property produce income in the taxable year involved for it to constitute property held for the production of income. *Frederick E. Rowe*, 24 T.C. 382 (1955). We hold that the attorneys' fees in the amount of $1,767 are properly deductible by petitioner as an expense during the taxable year for the management, conservation, or maintenance of property held for the production of income.

Petitioners also contend that the appraisal fee of $66.10 paid by them in 1956 is deductible under section 212(2) of the Internal Revenue Code of 1954 as having been paid for the management, conservation, or maintenance of property held for the production of income. Petitioners cite no authority for their contention. This payment was made to facilitate petitioner and the other two beneficiaries of the will of Amelia J. Ives in securing a loan. The expenditure is personal in nature and not deductible. Cf. *Joseph J. O'Donohue*, 33 T.C. 698 (1960).

### Issue 4.

Petitioners claim that the total amount of $6,270 paid by them in 1957 to the Hampshire Country School on behalf of their son constitutes deductible medical expenses under section 213 of the Internal Revenue Code of 1954 and the regulations issued pursuant thereto.[1]

Petitioner further relies on respondent's Revenue Ruling 55-261,

[1] SEC. 213. MEDICAL, DENTAL, ETC., EXPENSES.

(a) ALLOWANCE OF DEDUCTION.—There shall be allowed as a deduction the following amounts of the expenses paid during the taxable year, not compensated for by insurance or otherwise, for medical care of the taxpayer, his spouse, or a dependent (as defined in section 152):

\* \* \* \* \* \* \*

(e) DEFINITIONS.—For purposes of this section—
 (1) The term "medical care" means amounts paid—
  ;(A) for the diagnosis, cure, mitigation, treatment, or prevention of disease, or for the purpose of affecting any structure or function of the body \* \* \*
Income Tax Regs., sec. 1.213–1(e)(v). The cost of in-patient hospital care (including the cost of meals and lodging therein) is an expenditure for medical care. The extent to which expenses for care in an institution other than a hospital shall constitute medical care is primarily a question of fact which depends upon the condition of the individual and the nature of the services he receives (rather than the nature of the institution). A private establishment which is regularly engaged in providing the types of care or services outlined in this subdivision shall be considered an institution for purposes of the rules provided herein. In general, the following rules will be applied:
(a) Where an individual is in an institution because his condition is such that the availability of medical care (as defined in subdivisions (i) and (ii) of this subparagraph) in such institution is a principal reason for his presence there, and meals and lodging are furnished as a necessary incident to such care, the entire cost of medical care and meals and lodging at the institution, which are furnished while the individual requires continual medical care, shall constitute an expense for medical care. For example, medical care includes the entire cost of institutional care for a person who is mentally ill and unsafe when left alone. While ordinary education is not medical care, the cost of medical care

1955–1 C.B. 307, as modified by Revenue Ruling 58–280, 1958–1 C.B. 157.[2]

Respondent contends that the facts in the instant case do not fall within the provisions of the regulations or Revenue Ruling 58–280, *supra.* Petitioners' son was not mentally retarded or physically handicapped. Respondent contends that the record shows that the primary purpose for which petitioners' son was sent to the Hampshire Country School was education. We have set forth in our findings in some detail the history of the education of petitioners' son, the nature of the Hampshire Country School, and the services rendered to the children who attended the school, including petitioners' son. From these facts we conclude that Skip was sent to the Hampshire Country School for a dual purpose; namely, to overcome his emotional insecurity and to receive an education.

We do not believe that the record supports a conclusion that the principal reason for Skip's attendance at the Hampshire Country

includes the cost of attending a special school for a mentally or physically handicapped individual, if his condition is such that the resources of the institution for alleviating such mental or physical handicap are a principal reason for his presence there. In such a case, the cost of attending such a special school will include the cost of meals and lodging, if supplied, and the cost of ordinary education furnished which is incidental to the special services furnished by the school. Thus, the cost of medical care includes the cost of attending a special school designed to compensate for or overcome a physical handicap, in order to qualify the individual for future normal education or for normal living, such as a school for the teaching of braille or lip reading. Similarly, the cost of care and supervision, or of treatment and training, of a mentally retarded or physically handicapped individual at an institution is within the meaning of the term "medical care."

(*b*) Where an individual is in an institution, and his condition is such that the availability of medical care in such institution is not a principal reason for his presence there, only that part of the cost of care in the institution as is attributable to medical care (as defined in subdivision (i), and (ii) of this subparagraph) shall be considered as a cost of medical care; meals and lodging at the institution in such a case are not considered a cost of medical care for purposes of this section. For example, an individual is in a home for the aged for personal or family considerations and not because he requires medical or nursing attention. In such case, medical care consists only of that part of the cost for care in the home which is attributable to medical care or nursing attention furnished to him; his meals and lodging at the home are not considered a cost of medical care.

    [a] Rev. Rul. 58–280.

While ordinary education is not medical care, the cost of medical care is considered to include the cost of attending a special school for a mentally or physically handicapped individual, if his condition is such that the resources of the institution for alleviating such mental or physical handicap are a principal reason for his presence there. In such a case, the cost of attending such a special school will include the cost of meals and lodging, if supplied, and the cost of ordinary education furnished which is incidental to the special services furnished by the school. Thus, the cost of medical care includes the cost of attending a special school designed to compensate for or overcome a physical handicap, in order to qualify the individual for future normal education or for normal living, such as a school for the teaching of braille or lip reading. Similarly, care, supervision, treatment and training of a mentally retarded individual at an institution is within the meaning of the term "medical care."

    \*      \*      \*      \*      \*      \*      \*

A distinction must be made, however, in cases involving the costs of sending a problem child to a special school where the curriculum and disciplinary methods employed have a beneficial effect on the child's attitude. Such costs are not includible as a medical expense under either the 1939 Code or the 1954 Code. See *Gordon Pascal et ux* v. *Commissioner,* Tax Court Memorandum Opinion entered June 19, 1956.

School was the alleviation of his emotional difficulties. The record is barren of any evidence that Skip's emotional problems could not have been adequately treated at home or while he was in attendance at any other school. In fact, he had been receiving psychiatric therapy while in attendance at the last school he attended before going to Hampshire Country School. There is no evidence in the record that this treatment could not have continued or that he would not have been permitted to continue in that school with such psychiatric help. The sole evidence on this point is that Emery, the doctor who was treating Skip while he attended the Avon School, advised that he be placed the next year in the Hampshire Country School. It is clear from the testimony and the record that the Hampshire Country School has a good educational program as well as rendering psychological and psychiatric services to the student.

However, we think it is equally clear that one of the reasons that Skip was sent to Hampshire Country School was the availability of psychological and psychiatric help at the school, that he did receive this help while in attendance there, and that a part of the fees paid to the school was for these psychological and psychiatric services. The regulations on which both parties rely provide, "The extent to which expenses for care in an institution other than a hospital shall constitute medical care is primarily a question of fact which depends upon the condition of the individual and the nature of the services he receives (rather than the nature of the institution)." Certainly, the definition of medical expenses is sufficiently broad to include amounts paid to qualified psychologists and psychiatrists, and respondent has, in fact, so ruled. Rev. Rul. 143, 1953-2 C.B. 129. The testimony is clear that the director of the Hampshire Country School was a qualified psychologist, that there were other qualified psychologists and psychiatric social workers on the staff of the Hampshire Country School, and that there was on the staff a qualified psychiatrist who visited the school once a week. There is nothing in the statute, or in respondent's regulations and rulings on which both parties rely to indicate that amounts paid to an institution for medical expenses are not deductible merely because the principal reason for attendance at the institution is not the alleviation of a mental or physical handicap. Such amounts as are paid to the institution solely for the treatment of a mental or emotional illness are deductible, irrespective of the principal reason for the person's presence in the institution. Cf. Rev. Rul. 54-457, 1954-2 C.B. 100; and sec. 1.213-1 (e) (1) (v) (b), Income Tax Regs.

The record is not as adequate as might be desired for furnishing a basis for allocating the $6,270 paid by petitioner between the amounts paid for regular educational functions of the school, including Skip's

room and board and recreation, and the amount paid for psychological and psychiatric therapy. The record does show that after leaving the Hampshire Country School Skip attended a private college preparatory school at a cost for tuition, room, and board of $2,200 a year. There is no showing of the private tutoring, if any, given to Skip at the college preparatory school or whether this preparatory school was attended on a 9-month or year-round basis. However, weighing most heavily against petitioner for the deficiencies in the evidence and considering the fact that Skip was at the Hampshire Country School the entire year 1957 and received educational help comparable to tutoring, we hold that $3,270 of the payment made by petitioner to the Hampshire Country School was primarily for Skip's education and recreation and is not deductible as a medical expense. The remaining portion of the payment in the amount of $3,000, we hold to constitute a payment for the services of a qualified psychologist and psychiatrist for the alleviation of mental and emotional illness and to constitute deductible medical expenses.

*Decision will be entered under Rule 50.*