NORMAN ENDE and BEATRICE S. ENDE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Ende v. Commissioner
Docket No. 7190-73.
United States Tax Court
T.C. Memo 1975-256; 1975 Tax Ct. Memo LEXIS 116; 34 T.C.M. (CCH) 1096; T.C.M. (RIA) 750256; August 7, 1975, Filed Samuel J. Foosaner, for the petitioners. William J. Salica, for the respondent. FORRESTER
MEMORANDUM FINDINGS OF FACT AND OPINION FORRESTER, Judge: Respondent has determined the following deficiencies in, and an addition to, petitioners' Federal income taxes: Sec. 6651(a) TYE
Deficiency
(addition to tax)
12/31/67
$3,534.76
$81.87
12/31/68
1,309.57
*117 Because of concessions by both parties, only the following issues remain for our decision: (1) whether petitioners may deduct, under section 213, I.R.C. 1954, [1] certain expenses, including tuition, and room and board allegedly incurred for their daughter, in connection with her participation in ballet classes in 1967 and 1968; (2) whether petitioners are entitled to any more than $398.07 as a home office deduction for 1968; (3) whether petitioners are liable for a late filing penalty, pursuant to section 6651(a), for their 1967 taxable year. FINDINGS OF FACT Some of the facts have been stipulated and are so found. Petitioners Norman Ende (hereinafter referred to as petitioner) and Beatrice S. Ende (Beatrice) are husband and wife who, at the time of the filing of the petition herein, resided in East Orange, New Jersey. They filed their joint 1967 and 1968 calendar year Federal income tax returns with the District Director of Internal Revenue, Atlanta, Georgia. Issue 1. Medical Expense Deductions
In *118 1964, petitioner, who was a doctor, resided with Beatrice and their 14-year old daughter Leigh in Nashville, Tennessee. One day during the summer of that year, Leigh went to another doctor for a routine physical checkup. After such checkup, Leigh told petitioner that the doctor had spent several minutes examining her back. Upon hearing this, petitioner became concerned, and upon examining her back himself discovered that Leigh was probably suffering from scoliosis, the disease commonly referred to as curvature of the spine. Scoliosis is generally thought to be caused by a muscular imbalance. Such imbalance causes a pulling on the spinal bones, eventually resulting in deformity. The condition, which affects one to two percent of the female population, is most serious if developed prior to the period of a child's most rapid growth, for growth of the child will increase the curvature. At the time petitioner examined Leigh, the curvature of her spine was approximately 13degree. After performing certain bone tests petitioner was convinced that Leigh would very soon enter a period of rapid growth, [2] consequently he decided that immediate corrective treatment of the scoliosis was necessary. *119 In 1964, there were three generally accepted types of treatments for scoliosis. One was for the child to wear a mechanical brace, known as the "Milwaukee Brace." This brace consisted of two connected circular metal pieces, one resting on the child's hips, the other lodged under the child's chin. The purpose of the brace was to cause the child to hold his head in a more upright position, thus causing an elongation of the spine. Another type of accepted treatment was a spinal fusion operation, by which so-called Harrington rods would be surgically inserted against the spine in an effort to correct, or at least stabilize the curvature. The third type of treatment was more conservative, consisting of a regime of highly vigorous exercises. Petitioner consulted with three other doctors in deciding upon the proper course of treatment for Leigh. Dr. Arthur Brooks, professor of orthopedic surgery at Vanderbilt University, was very pessimistic as to Leigh's condition. It was his feeling that the brace treatment was immediately necessary because of Leigh's expected growth. Dr. J. William Hillman, who was chairman of the department of *120 orthopedic surgery at Vanderbilt was undecided as to the best treatment, although he did think that the exercise route would be an acceptable method. The other doctor petitioner consulted was a physiatrist, and it was his opinion that exercise would be the most appropriate method of treatment. The exercise route--with ballet dancing to provide the most substantial portion of such exercise--was finally decided upon by petitioner. Leigh was athletically inclined, and, from the time she had been three years old, had often taken lessons in ballet. From December of 1963 to March 1964, she had been enrolled in the winter session of the Washington Academy of the Ballet (the "Academy"), a school offering highly intensive training in ballet dancing. Because of Leigh's longtime interest in ballet, petitioner felt strongly that the exercise route would be the most appropriate and effective treatment for her scoliosis, and certainly more palatable for her than the wearing of an unsightly brace. In September of 1964, Leigh began attending the Academy as a full-time resident student. The Academy had been founded in 1962 as a school combining college preparatory academic study and intensive training *121 in ballet. From nine o'clock to noon each week day, students took basic high-school academic courses. The afternoons were devoted to intensive training in ballet, including exercises. If a show was scheduled, the students might also spend two or three hours in the evening practicing for the performance. Thus, anywhere from 15 to 30 hours per week were devoted solely to training in ballet. During the period Leigh attended the Academy, which was from September of 1964 to June of 1967, she was enrolled in the required academic and ballet classes. Her curriculum was no different from that of any of the other students then attending the Academy. The dance classes were taught by individuals experienced in ballet, but none of such teachers were either doctors or physical therapists. In addition to the exercise she received from the ballet during the period spent at the Academy, Leigh also performed a set of special orthopedic exercises recommended for her by a physiatrist. These included walking exercises, together with others performed while lying down on a mat. Leigh carried out these specially prescribed exercises each evening in the presence of her housemother in the Academy dormitory. *122 The housemother, who had no experience in physical therapy, received no extra compensation for seeing to it that Leigh was faithful to the prescribed regime of exercise. Finally, in addition to the ballet and special orthopedic exercises, Leigh went several times during the academic year to Dr. Robert C. Rush, an orthopedic surgeon in Washington, who monitored Leigh's progress for petitioner. During 1967, Leigh attended the Academy from February through June. Expenses for tuition, room, board, and school supplies for that period totaled $1,288.09. During January of 1967, Leigh was enrolled in the Professional Children's School (the "Professional School") in New York City. Attendance at this school, which offered no academic subjects, was thought necessary because of an ankle injury sustained by Leigh sometime in 1966. Such injury made more difficult her participation in the ballet classes at the Academy, and it was petitioner's opinion that the Professional School, where classes were conducted by a physical therapist who was experienced in providing programs of exercise for injured dancers, would be more suitable to Leigh's special needs at that time. The tuition charge for the time *123 Leigh spent at the Professional School during 1967 was $125.84. In addition to charges for tuition, room and board, petitioner expended $350 on ballet supplies, including pointe shoes, for his daughter while she attended the Professional School and the Academy in 1967. An additional $50 was expended on the exercise mat which Leigh needed for her special evening exercises. Dry cleaning, laundry, and shoe repair expense for the January to June 1967 period totaled $60.75, and an additional $390.72 was expended by petitioner for long-distance phone calls between Nashville and Washington. These included conversations between Leigh and her parents, and between petitioner and Dr. Rush. Petitioner also gave Leigh $15.62 for tickets to various ballets, it being a requirement of the Academy that she attend such events. Leigh last attended the Academy in June of 1967. Her senior year of high school was spent at a high school in Atlanta, Georgia, and there is no indication in the record that this school offered ballet. Leigh continued to take ballet lessons after June of 1967, but the record is silent as to whether these further ballet lessons, not administered by the Academy or the Professional *124 School were in any way related to the scoliosis, which had been detected approximately three years previously. From June to August of 1967, Leigh toured and took classes with the American Ballet Theatre of New York; from August to December of that year she took lessons at the Atlanta School of Ballet in Atlanta, and from September to November, at the Southern Ballet School in Atlanta. These ballet classes cost petitioner $218.46 in 1967. In 1968, Leigh took lessons for the entire year at the Atlanta School of Ballet. Tuition at the school was $467.45 in 1968, with dance supplies costing petitioner an additional $309.75 in that year. At the time of the trial in the instant case, Leigh, who is still interested in ballet dancing, was a medical student at Tulane University. The curvature of her spine has never worsened from the 13degree estimated by petitioner in 1964, and it is his opinion that the program established for Leigh while she was attending the Academy is responsible for having stabilized her condition. On their 1967 and 1968 Federal income tax returns, petitioners claimed medical expenses of $8,659.32 and $1,648.70, respectively, which after taking into account the statutory *125 percentage limitation resulted in claimed medical deductions of $7,629.60 and $806.79, respectively. Respondent, in his statutory notice of deficiency, disallowed the following claimed medical expenses: "Drugs" (duplicated and previously claimed under "medicine and drugs") 1967--$175.21, 1968--$121.68, and the following items, all of which petitioner alleges were related to Leigh's attendance in 1967 and 1968 at the different schools and institutions described above: 1967
Clothes purchased for stays in
$1,934.70
New York & Washington, D.C.
Ballet Supplies
343.66
Travel & Personal Supplies
71.46
Dry Cleaning, Laundry, Shoe Repair
60.75
Flight fares, flight insurance stop over
556.34
charges, baggage, air freight charges
Washington School of Ballet Tuition,
1,288.09
room, board, school supplies
Ballet Tickets
15.62
Lodging: Hotel Bretton Hall, NYC
256.65
Hotel Sheraton Park, Wash., D.C.
125.31
Hotel Sheraton, NYC
59.60
Hotel Ruxton, NYC
594.64
Meals, taxis, phone calls
400.00
(20 days at $20.00 daily)
Meals, Taxis, apt. supplies, phone
1,043.79
calls busfare
Tuition: Professional Children's
125.84
School, NYC
Luggage purchased
72.13
Ballet classes: Am Ballet Theatre
Southern School
218.46
Atlanta School
Long distance telephone calls
390.72
1968
Tuition for ballet classes
467.45
Dance supplies
309.75
Gasoline to and from daily
121.68
classes (6 days weekly)
*126 Issue 2. Home Office Deduction
During 1967, petitioner purchased a home in Atlanta, Georgia. In one room of such home petitioner, who was then associated with the Department of Pathology of Emory University in Atlanta, worked on articles he would publish in medical journals, as well as on a research project in which he was engaged with another doctor. During 1968, petitioner purchased a desk for such home office at a cost of $500. Also in the same year, petitioner had a central air-conditioning system installed in the home at a cost of $1,450. On his 1968 return, petitioner claimed home office expense deductions in the following amounts: Office supplies
$ 127.73
Adding Machine
51.38
Furniture, carpeting, decorative
1,185.92
accessories, fee for decorator
Utilities (1/8 of total yearly
78.00
bill for entire home)
Principal payments on mortgage
56.56
(1/8 of total)
Local telephone service
103.44
Air-conditioning (1/8 of total
182.00
purchase price)
Depreciation (based on cost of home
192.38
at $44,480, salvage value of
$4,000, 25-year useful life, and
1/8 of such total allocable to
office)
$1,977.41
In his statutory notice of deficiency, *127 respondent disallowed all but $398.07 of such claimed deductions. At trial respondent explained that $285.88 of such deductions were allowable in the following categories: Office supplies
$ 50.00
Local telephone service
92.88
Air-conditioning
12.50
Depreciation
130.50 He further indicated, at the trial, that he had allowed only depreciation on the carpet, and had totally disallowed the expenses claimed for furniture, decorative accessories, and the adding machine. His treatment of the other items on petitioner's return has not been explained. Issue 3. Late Filing Penalty
Petitioners' 1967 Federal income return was stamped "Received" by the Southeast Service Center on April 22, 1968. In his statutory notice of deficiency, respondent determined that petitioners were liable for a late filing penalty, pursuant to section 6651(a), for their 1967 taxable year. OPINION Issue 1. Medical Expense Deductions
In 1964, petitioner, a medical doctor, discovered that his 14-year old daughter was suffering from scoliosis, the disease commonly referred to as curvature of the spine. After consulting with two orthopedic surgeons and a physiatrist, and taking into *128 account Leigh's own special talents, petitioner decided that the exercises involved in ballet dancing would be beneficial in stabilizing her condition. Petitioner also decided that, together with the ballet dancing, Leigh should also perform daily a special set of orthopedic exercises and make regular visits to an orthopedic surgeon. The issue which we must decide is whether petitioner may deduct, as medical expenses under section 213, I.R.C. 1954, amounts he allegedly incurred, including tuition and room and board, in connection with Leigh's attendance at the Washington Academy of the Ballet (the Academy) and at certain other ballet schools. [3] In effect, petitioner is contending that in the instant case, we have finally been presented with that "rare situation" where dance instruction, ordinarily a personal activity the expenses of which are nondeductible because of section 262, may be "properly classified as medical care" for purposes of section 213. John J. Thoene,33 T.C. 62, 63 (1959). *129 In Thoene, as in Adler v. Commissioner,330 F. 2d 91 (9th Cir. 1964), affg. a Memorandum Opinion of this Court, such "rare situations" were found not to exist on the facts as found therein and the expenses of dancing lessons were held to be nondeductible. Here too, although for different reasons than those relied upon in Thoene and Adler, we hold that petitioner is not entitled to any deduction for expenses he incurred in connection with his daughter's ballet training. Before a taxpayer may deduct expenses under section 213 he must establish not only that the expenses were incurred for medical care as defined in section 213(e), but also that the expenses would not otherwise have been incurred for nonmedical reasons. Joel H. Jacobs,62 T.C. 813, 819 (1974). On the basis of the record before us, we simply cannot find that petitioner would not have incurred expenses for his daughter's ballet instructions had he not learned she was suffering from scoliosis. From a very early age Leigh was interested in ballet dancing. From the time she was *130 three or four years old she had been taking lessons "on and off" and had attended the winter session at the Academy from December of 1963 until March 1964. Furthermore, after withdrawing from the Academy in June of 1967, she continued taking lessons at other ballet schools, and the record does not establish that these further lessons had anything to do with her condition, which had been discovered three years earlier. Certainly, such facts made it incumbent upon petitioner to introduce some evidence that Leigh would not have been taking ballet classes in 1967 and 1968 had she not been suffering from scoliosis. Petitioner, however, did not even attempt to make such a showing. Petitioner did testify that his only reason for sending Leigh to the Academy was its reputation for providing the most intensive ballet training course in the country but he introduced no evidence whatsoever that he would not have incurred similar expenses at a local ballet school had the scoliosis not been discovered. Certainly the fact that the lessons and exercise were obtained at different schools is not enough to satisfy the "but for" standard. Petitioner points to all the other expenses he had to incur *131 by virtue of sending Leigh to a residence school in Washington, D.C. However, on the facts of this case, accepting arguendo petitioner's contention that the ballet constituted medical care for Leigh, only the expenses incurred for "medical care" would have merited consideration under section 213. C. Fink Fischer,50 T.C. 164, 175-176 (1968); Hobart J. Hendrick,35 T.C. 1223, 1237-1238 (1961). On the record before us such would have only included the part of her tuition allocable to the ballet lessons and the equipment and clothing required for dancing and her orthopedic exercises.[4] Petitioner has not shown that he incurred any additional expenses for the "medical care" of Leigh, as opposed to other personal and nondeductible expenses, than he would have incurred had he never discovered the scoliosis. [5]
*132 Where taxpayers attempt to obtain deductions for items or services usually considered to be personal, we have been very cautious in allowing deductions. H. Grant Atkinson, Jr.,44 T.C. 39, 49 (1965). Petitioner, who was represented by counsel, had every opportunity at trial to fulfill the "but for" requirement described above. Certainly the facts which were brought forth at trial should have lead him to see the importance of making such further showing. Petitioner having failed to do so, we hold that respondent correctly disallowed those deductions claimed by petitioner under section 213 for expenses he incurred in connection with Leigh's ballet training in 1967 and 1968. We add further, that as to those classes which Leigh took at other ballet schools after leaving the Academy, petitioner did not even attempt to demonstrate that these further lessons had anything to do with Leigh's scoliosis. Hence, he has not established that these constituted "medical care" for purposes of section 213. Edward A. Havey,12 T.C. 409, 412 (1949); Arnold P. Grunwald,51 T.C. 108, 115 (1968). *133 Issue 2. Home Office Deduction
As to this issue petitioner introduced no evidence to overcome the presumptive correctness of respondent's statutory notice, except in one respect. We think respondent erred in not allowing petitioner any deduction in 1968 for the desk he purchased in that year for $500. While there was little evidence in the record as to the useful life of such desk, we will apply the principal enunciated in Cohan v. Commissioner,39 F. 2d 540, 543-544 (2d Cir. 1930), and allow petitioner a further home office deduction for 1968 in the amount of $25. Issue 3. Late Filing Penalty
Finally, petitioner has introduced no evidence to overcome the presumptive correctness of respondent's determination of a late filing penalty for the 1967 taxable year. Hence, we uphold respondent's determination in this respect. Decision will be entered under Rule 155.
Footnotes
1. All statutory references are to the Internal Revenue Code of 1954 as applicable to the years herein involved, unless otherwise specified.↩
2. She did in fact grow 3-1/2 inches thereafter.↩
3. Petitioner does not contest respondent's disallowance of deductions claimed for "drugs" in 1967 and 1968, apparently conceding that such items were already deducted elsewhere on the returns.↩
4. Of the other items claimed on the return as medical expenses, the majority of which were completely unsubstantiated, only the amounts claimed for "flight fares…" might have given us further pause. However, nowhwere in the record did petitioner establish that these fares were for Leigh's transportation to school, as opposed to being for visits by him and Beatrice to their daughter during the academic year. Expenses for the latter type trip would have been purely personal, and the record gives us no help on any possible allocation. ↩
5. Except to the limited extent indicated below, however, we make no finding here as to whether any of the claimed expenses for 1967 and 1968 constituted "medical care."↩