## H. Grant Atkinson, Jr., and Eunice Atkinson, Petitioners, *v.* Commissioner of Internal Revenue, Respondent

Docket No. 1246–63.    Filed April 6, 1965.

*Sidney Goldstein*, for the petitioners.
*Allan B. Muchin*, for the respondent.

Harron, *Judge:* The Commissioner determined a deficiency in income tax for the taxable year 1961 in the amount of $650.91.

Petitioners' son attended a boarding school, a military academy, to which petitioners paid $1,824 during 1961 for his tuition, room and board, and other school expenses. The school did not provide any special medical care or treatment for petitioners' son. The only issue is whether the $1,824 is deductible as a medical expense under section 213 (a) and (e), 1954 Code; or whether the expenditure is a personal expense the deduction of which is proscribed by section 262.

### FINDINGS OF FACT

The stipulated facts are found as stipulated and are incorporated herein by reference.

Petitioners filed a joint return for 1961 with the district director of internal revenue at Chicago. Petitioners reside in Evanston, Ill., where they maintained their residence during 1961.

Andrew Atkinson, hereinafter referred to as Andrew, is petitioners' only child. He was 13 years old in 1961. The date of his birth is May 2, 1948.

Andrew attended Williams Military Academy in Wheaton, Ill., hereinafter referred to as Williams, during 3 school years, as follows: September 13, 1959, through June 5, 1960; September 11, 1960, through June 4, 1961; and September 10, 1961, until the time of his graduation on June 3, 1962.

During 1961, petitioners paid $1,824 to Williams for the school year beginning on September 10, 1961, and ending on June 3, 1962.

Williams makes the same charge to each student for a school year of 36 weeks, $1,800, consisting of $1,500 for tuition, board, and lodging (which is not broken down into specific charges); $200 for school uniforms; and $100 for a general "expense account." The record does not show why petitioners paid an additional $24. The head of the school testified that the charge of $100 includes a physical examination and minor medical care at the school, books, school supplies, laundry, and drycleaning, but the total sum is not broken down into any specific amounts.

Williams Military Academy is an accredited school for boys, of the ages of 7 to 14 years, in the elementary and junior high grades. It is chartered by the State of Illinois and is a member of the Illinois Elementary School Association and the Independent School Association of Greater Chicago. It is a preparatory school for high school, and is a boarding school. It is located in Wheaton, Ill., which is 25 miles west of Chicago and not more than 50 miles from Evanston. Col. Paul E. Williams is the superintendent. Williams Military Academy is primarily an educational institution which includes in its curriculum "the regular course of study offered in any public school plus additional studies," physical education, and military training. The students are called cadets. Through a system of awards and commissions, the cadets are encouraged "to earn officerships" in the school's system of commissions, which are "Acting Officer," "P.F.C.," "Corporal," "Sergeant," "Second Lieutenant," "First Lieutenant," "Captain," and "Major." The military training, which includes military drill, teaches the cadets discipline, punctuality, routine, orderliness, neatness, and manners, how to give orders and take orders, and how to get along with people. The system of discipline involves giving a cadet merits for good performance, and demerits for failure to comply with rules and regulations. For too many demerits, the individual is denied certain privileges, such as visits to his home or visits with his parents at the school. In general, the cadets are supervised at all times; each day the assignments for the day must be completed. The extra courses given in the eighth grade include certain high school courses, such as algebra, Latin, grammar, and biology, as well as military training. Williams is located on a campus consisting of various buildings and grounds; there are living quarters, study halls, library, recreation rooms, gymnasium, and a swimming pool.

Williams does not have a doctor on its staff, but it engages one on the basis of being subject to call. He gives the students their physical examinations, and minor medical care, if needed. A practical nurse is

in attendance at the school to take care of minor complaints, such as a cut finger. Major medical care is the responsibility of the parents. If a student is ill, the school doctor is called in; if the nature of the illness is other than minor, the doctor who serves the school will advise the school authority to notify the parents. The cost of major medical care must be paid by the student's parents.

Williams does not have any special medical program, and it does not represent to prospective patrons that it is an institution to which individuals may be sent for any general or particular medical care. Williams is not equipped to handle any unusual mental or emotional problem of a student; it does not have any special classes or regimen for emotionally disturbed children, outside of the general counseling that may be given to any boy attending the school.

The general program of Williams involves spending 7 hours each day in the classroom, 5 days a week, and the incentives are emphasized of earning merits, obtaining the "commission" of an "officer," making the "crack squad" drill team, and earning various honors. Williams regards its systems of discipline and various activities as beneficial to a growing boy because he has something to do at all times and is busy, he learns self-reliance and self-discipline, he can earn a place of importance in the school, and he receives good mental and physical training.

After graduating from Williams in June 1962, Andrew attended a public school in Evanston, the Township High School, which he still attends; and he lived at home with his parents.

Andrew developed an epileptic condition when he was 5 years old, in 1953, which he still has. Occasionally, he has had the *grand mal* which is a severe attack in which the individual becomes unconscious. But usually his attacks or spells are of the relatively milder type which last for a few seconds or minutes. He had these spells periodically and irregularly, but not with great frequency, during the period involved here, 1959–61, and thereafter. During such spells, there is a distortion of his awareness, he will sit rigidly or very quietly, sounds become very dim, he does not hear what is said to him, he is unable to talk, and afterwards he is nervous and weak. At all times, Andrew has been under a doctor's care and has taken medication for this condition. He will continue to take the medication after the spells end so that they will not return. Doctors cannot predict how many years an epileptic condition will persist. Such condition has been known to end when an individual is about 22 years old, or at an earlier age; and it has been known to continue well into a person's adult years, even up to 77 years of age.

Except for the epileptic attacks, Andrew was apparently in good physical condition; i.e., he could take physical exercise; he did not

have any physical handicap; he walked normally; he did not have any abnormal discoordination or lack of muscular control.

The following is indicative of the extent of the occurrence of Andrew's epileptic spells during the years 1959–64: He had 4 spells between January 15 and September 15, 1959; from September 15, 1959, to June 1960 there were none; between June and August 6, 1960, it was reported to his doctor that he had 3 or 4 spells, but the doctor had some doubt because nobody witnessed any; from September 1960 to September 1961, there was 1 mild spell; from September 1961 to June 1962, there were 3 spells, but Andrew was taking his medication very irregularly; from June 1962 until June 1963, there were none, but after school closed in June 1963, he reported that he had about 12 spells. Thereafter, in January 1964, he had a severe attack which persisted for several minutes. He was taken to a hospital emergency room in a state of unconsciousness and rested there until the attack was over, rest being the only "treatment" that is given.

In the treatment of epilepsy continuous and regular medication is necessary. If no medication is taken or if it is taken irregularly, the attacks recur.

In Evanston, Andrew's doctor at first was Lawrence Breslow. Early in 1959, petitioners took Andrew to another physician in Evanston, Meyer Brown, who has looked after Andrew since then and is still his doctor. The first visit to Brown was on January 15, 1959. Brown prescribed additional medication. Andrew went to Brown's office for a checkup periodically, every 2 or 4 or 6 weeks. Brown has never witnessed one of Andrew's epileptic attacks and knows of them only by reports received from Andrew and his parents. Brown is a neurologist who treats patients with epilepsy, and he also is a psychiatrist.

Petitioners moved to Evanston in 1956 or 1957. At all times material, including 1959, they have lived in an apartment. After moving to Evanston, petitioners enrolled Andrew in the Lincoln School, a public school in Evanston, in the fourth grade. Although Andrew did not get on well at the Lincoln School, he was promoted to each successive grade in school. In 1958 and 1959, Andrew's behavior gave his parents a good deal of concern. For example: Andrew got into fights at school with younger children, boys and girls; he did not get on well with other children; he did not have any friends; he had difficulty learning to read; he neglected his studies; he lied to his parents about his fights with other children (which he denied), and about attending to his studies and receiving acceptable grades (neither of which was true). He joined the Boy Scouts, and in July 1959, he went on an overnight camping trip with them, during which he ripped a tent with his scout knife, for which he was expelled from the group.

Petitioners discussed Andrew's behavior with the principal and his chief teacher at the Lincoln School. The problem was that Andrew did not do his schoolwork, he would not pay attention in his classes to the teachers or to the other students, he would sit in class looking out of the window, and he was generally uncooperative in school; but he was not "rebellious" in classes or at school. Petitioners believed that Andrew had become a real problem in his general attitudes and behavior. He was insolent towards adults. At the Lincoln School, the principal and Andrew's chief teacher "suggested" that petitioners might take Andrew to a psychological, or psychiatric, clinic as a means of helping to overcome the above attitudes.

In 1959, Andrew was 11 years old. He was in the fourth and fifth grades at the Lincoln School.

Petitioners discussed the above problem with Andrew's doctor, Meyer Brown. Brown's analysis, as a psychiatrist, of Andrew's behavioristic problem was that Andrew was having difficulties in making adjustments at school with his teachers and other children, and at home with his parents and that, in psychiatric terms, Andrew's behavior represented "aggressive behavior" and "hostility" towards authority; that he lied to make himself seem more important; that he was deceitful in order to avoid responsibility for his acts; and that he was hostile toward and resentful of any authority.

Andrew was not having enough epileptic spells, or ones which were serious enough, to interfere with or disrupt his schoolwork. The spells at that time did not occur at school.

Andrew's home environment, according to Brown's belief, contributed to his general behavioristic problem. Andrew's father was away from home a good deal in 1958 and 1959 because of the traveling required by his occupation. His mother is a very nervous, excitable person, who worries. Also, she worked from time to time. There was a great deal of emotional tension and strife in the petitioners' home. It was Brown's opinion that in 1959 Andrew was not doing well in his home environment, and in the public school, and that he had an "emotional" problem.

Brown recommended to petitioners that they should send Andrew away from home to a boarding school, a military academy, where discipline would be maintained 24 hours a day. He believed that in such environment, away from home, a good deal of Andrew's behavioristic and emotional problems would be controlled and overcome; that he would do better if he was in an environment where he would live within a disciplinary system which was imposed upon him by strangers and his fellow students, and that a military or boarding school would provide such environment. However, Brown did not recommend any particular school, and he did not recommend that Andrew should

attend a boarding school for any particular length of time. Subsequently, when petitioners discussed the Williams Military Academy with him, Brown did not visit that school or look into its arrangements. From petitioners' report about Williams, Brown believed it would be a suitable boarding school for Andrew. Brown's advice that Andrew should attend a military school was not for the purpose of obtaining medical attention for him at such school.

Williams does not have any special courses for emotionally disturbed children.

The Williams Military Academy emphasizes discipline. The director of Williams believes that discipline gives a boy a feeling of importance. The school is run on the basis of rules.

Andrew took the same courses at Williams as the other students in his school grades and years, and he participated in the general physical activities.

Andrew continued to see his doctor, Meyer Brown, periodically, while he attended Williams.

At the time Andrew entered Williams, he was having fewer epileptic attacks. The decrease in the attacks apparently was the result of Brown's having prescribed entirely different and more medication.

At Williams, Andrew started in the sixth grade and completed the eighth grade, which is as far as the courses of study go.

It was the opinion of the director of Williams that when Andrew entered the academy he was a "nonconformist"; rules and regulations seemed to irritate him a little bit and he did not like to adhere to and follow them. But after being at Williams for a short time, Andrew's attitude changed and he followed and adhered to the school's rules and regulations. He became a very good student; he became very stable; he progressed; he was anxious to succeed; he became a commissioned "officer"; and he was musical director of the boys chorus at the graduation exercise.

Petitioners noticed a great improvement in Andrew's behavior and attitudes after he entered Williams. For example: At Williams, Andrew learned how to conduct himself with other people and how to get along with people; his manners improved "enormously"; he was respectful towards adults. Also, he made good friends at Williams. Andrew's father was satisfied that the Williams Military Academy did a very good job in improving Andrew's behavior, conduct, and attitudes. Andrew's doctor, Meyer Brown, observed that Andrew was happy and well adjusted at Williams; he applied himself to his work and did better in his schoolwork, and received better grades; he enjoyed a better relationship with his parents; he got along better with his fellow students; and he took great pride in his uniform.

Andrew continued having epileptic spells after graduating from Williams, and still has them.

In their joint return for 1961, petitioners listed among their claimed medical expenses total payments to Breslow of $27, and to Meyer Brown of $50. The record does not show or explain what other expenses were incurred and paid in 1961 for medical services to Andrew, such as fees of doctors and similar expenses.

Petitioners took a deduction in their return for medical and dental expenses in the amount of $2,329.71, in their itemized deductions, which was based upon total, itemized, medical expenses of $2,803.10, which sum included $1,824 paid to Williams Military Academy. Respondent disallowed the deduction of $1,824 and made an additional mathematical adjustment in the allowable medical expense deduction required by the resulting increase in adjusted gross income and the percentage limitations of section 213 of the 1954 Code. Respondent disallowed the claimed deduction in issue because he determined that it did not qualify as an expense for the "medical care" of a dependent under section 213 (a) and (e).

Out of $1,824 paid to Williams, $25 was for a physical examination, and $1,799 was for Andrew's tuition, board and lodging, uniforms, and general school expenses. The sum of $1,799 was primarily and directly an expense for the ordinary and basic education of Andrew; it was not the cost of attending a special school for a mentally or physically handicapped individual; it was the cost of ordinary education which was not incidental to any special services of Williams furnished to Andrew. There was no special medical attention, care, or treatment given to Andrew during 1961 at Williams. At Williams, Andrew received the usual, ordinary, and normal attention and training which was given to all of the students in his class and grade.

The sum of $1,799 which was paid in 1961 to the Williams Military Academy was a personal, nondeductible expense of petitioners, and it was not an expenditure for medical care of Andrew within the scope of section 213 of the 1954 Code; $25 is deductible medical expense.

OPINION

The question is whether $1,824 paid to the Williams School is a deductible expense for medical care within the scope and meaning of section 213 (a) and (e)(1)(A)[1] of the 1954 Code, or was nondeductible personal, living, and family expense under section 262.

---

[1] SEC. 213. MEDICAL, DENTAL, ETC., EXPENSES.

    (a) ALLOWANCE OF DEDUCTION.—There shall be allowed as a deduction the following amounts of the expenses paid during the taxable year, not compensated for by insurance or otherwise, for medical care of the taxpayer, his spouse, or a dependent (as defined in section 152):

       \*       \*       \*       \*       \*       \*       \*

    (e) DEFINITIONS.—For purposes of this section—

      (1) The term "medical care" means amounts paid—

        (A) for the diagnosis, cure, mitigation, treatment, or prevention of disease, or for the purpose of affecting any structure or function of the body (including amounts paid for accident or health insurance)\* \* \*

Petitioners contend that Andrew's attendance at Williams was "therapeutical," with respect to his maladjustments and the control of his epileptic spells, and was "prescribed" by his physician, and therefore the expense thereof constituted expense of medical care under section 213. Petitioners stress the point that Dr. Brown prescribed sending their son to a boarding school of a military type where discipline during 24 hours each day is a principal part of the curriculum.

Respondent relies upon the provisions of his regulations promulgated under section 213, section 1.213–1(e)(1), Income Tax Regs., pertinent portions of which are set forth in the margin.[2] Respondent

---

[2] Sec. 1.213–1(e)(1) of the regulations provides in part:

"(e) *Definitions*—(1) *General.* (i) The term 'medical care' includes the diagnosis, cure, mitigation, treatment, or prevention of disease. Expenses paid for 'medical care' shall include those paid for the purpose of affecting any structure or function of the body, for accident or health insurance, or for transportation primarily for and essential to medical care. * * *

"(ii) Amounts paid for operations or treatments affecting any portion of the body, including obstetrical expenses and expenses of therapy or X-ray treatments, are deemed to be for the purpose of affecting any structure or function of the body and are therefore paid for medical care. Amounts expended for illegal operations or treatments are not deductible. Deductions for expenditures for medical care allowable under section 213 will be confined strictly to expenses incurred primarily for the prevention or alleviation of a physical or mental defect or illness. Thus, payments for the following are payments for medical care: hospital services (including nurses' board where paid by the taxpayer), medical, laboratory, surgical, dental and other diagnostic and healing services, X-rays, medicine and drugs (as defined in subparagraph (2) of this paragraph, subject to the 1-percent limitation in paragraph (b) of this section), artificial teeth or limbs, and ambulance hire. However, an expenditure which is merely beneficial to the general health of an individual, such as an expenditure for a vacation, is not an expenditure for medical care.

*          *          *          *          *          *          *

"(v) The cost of in-patient hospital care (including the cost of meals and lodging therein) is an expenditure for medical care. The extent to which expenses for care in an institution other than a hospital shall constitute medical care is primarily a question of fact which depends upon the condition of the individual and the nature of the services he receives (rather than the nature of the institution). A private establishment which is regularly engaged in providing the types of care or services outlined in this subdivision shall be considered an institution for purposes of the rules provided herein. In general, the following rules will be applied:

"(a) Where an individual is in an institution because his condition is such that the availability of medical care (as defined in subdivisions (i) and (ii) of this subparagraph) in such institution is a principal reason for his presence there, and meals and lodging are furnished as a necessary incident to such care, the entire cost of medical care and meals and lodging at the institution, which are furnished while the individual requires continual medical care, shall constitute an expense for medical care. For example, medical care includes the entire cost of institutional care for a person who is mentally ill and unsafe when left alone. While ordinary education is not medical care, the cost of medical care includes the cost of attending a special school for a mentally or physically handicapped individual, if his condition is such that the resources of the institution for alleviating such mental or physical handicap are a principal reason for his presence there. In such a case, the cost of attending such a special school will include the cost of meals and lodging, if supplied, and the cost of ordinary education furnished which is incidental to the special services furnished by the school. Thus, the cost of medical care includes the cost of attending a special school designed to compensate for or overcome a physical handicap, in order to qualify the individual for future normal education or for normal living, such as a school for the teaching of braille or lip reading. Similarly, the cost of care and

contends that the basic reason for Dr. Brown's recommendation was that Andrew was having difficulties in school and there was emotional tension at home, and the combination of Andrew's home environment, the kind of parents he had, and his own emotional makeup made it advisable to send him to a residential school where he would be in a different environment and would be obliged to follow regular schedules based on a system of discipline which was not provided sufficiently at home. Respondent contends also, since Williams did not provide any medical services, medical care, psychiatric care, or special treatment for alleviating physical, psychological, emotional, or mental problems, and provided only a regular educational program, the education services provided by Williams did not constitute "medical care" within the meaning of section 213, and therefore the payment for tuition, uniforms, and incidental school expenses cannot qualify as deductible medical care expenses. Respondent also contends that the fact that Dr. Brown recommended that Andrew should be sent to some private school of a residential and military type does not make or qualify the tuition and living expense as medical care expense within the scope of section 213. Respondent's position is that the expense of sending Andrew to the Williams School was nondeductible personal expense under section 262.

This Court has considered in earlier cases the intent of the Congress which underlies the provision for the allowance of deduction of medical care expense as shown by the legislative history and the committee reports relating to section 213 of the 1954 Code, which reenacted section 23 (x) and incorporated the wording of that predecessor provision in the 1939 Code. See *Max Carasso*, 34 T.C. 1139, affd. 292 F. 2d 367 (C.A. 2, 1961); *Martin J. Lichterman*, 37 T.C. 586 (1961). Subsequently, in *Commissioner* v. *Bilder*, 369 U.S. 499 (1962), the Supreme Court reviewed the legislative history of section 213 and the purpose of the Congress as revealed by House and Senate committee reports. Here, we need only cite and refer to the above cases and need not re-

supervision, or of treatment and training, of a mentally retarded or physically handicapped individual at an institution is within the meaning of the term 'medical care'.

"(b) Where an individual is in an institution, and his condition is such that the availability of medical care in such institution is not a principal reason for his presence there, only that part of the cost of care in the institution as is attributable to medical care (as defined in subdivisions (i) and (ii) of this subparagraph) shall be considered as a cost of medical care; meals and lodging at the institution in such a case are not considered a cost of medical care for purposes of this section. For example, an individual is in a home for the aged for personal or family considerations and not because he requires medical or nursing attention. In such case, medical care consists only of that part of the cost for care in the home which is attributable to medical care or nursing attention furnished to him; his meals and lodging at the home are not considered a cost of medical care."

state all that has been already fully analyzed in similar cases. It is sufficient to note the following:

Congress made it clear originally that the benefit of the deduction it was creating for "medical expenses" by enacting section 23(x) in the 1939 Code was not to encompass items which are primarily personal living expenses for which deductions were expressly prohibited by section 24(a), 1939 Code. Thus in S. Rept. No. 1631, 77th Cong., 2d Sess., p. 96, the Senate Committee on Finance limited its definition of "medical care" by the following:

It is not intended, however, that a deduction should be allowed for any expense that is not incurred *primarily* for the prevention or alleviation of a physical or mental defect or illness. [Italics supplied.]

See *L. Keever Stringham*, 12 T.C. 580, 583–584, affirmed per curiam 183 F. 2d 579. In the *Stringham* case (p. 584), we said:

the language used in the statutory definition and the report of the Senate Finance Committee is sufficiently specific to exclude [from the category of deductible medical care expenses], except as to diagnosis, amounts expended for the preservation of general health or for the alleviation of physical or mental discomfort which is unrelated to some particular disease or defect.

Secondly, it is clear that a deduction may be claimed only for such expense as is *incurred primarily for* the prevention or mitigation of the particular physical or mental defect or illness.

Examination of the parts of the committee reports accompanying the enactment of the 1954 Code which deal with section 213 shows that in reenacting section 23(x) as section 213 of the 1954 Code, there was not any change in the foregoing basic legislative purpose and it was carried over in the enactment of section 213, with certain clarification represented by enacting section 213(e)(1)(B) (relating to the cost of transportation primarily for and essential to medical care). See the following committee reports: H. Rept. No. 1337, 83d Cong., 2d Sess., p. 30; S. Rept. No. 1622, 83d Cong., 2d Sess., pp. 35, 219–220; and Detailed Discussion of the Technical Provisions of the Bill, H. Rept. No. 1337, *supra* at A60. See also *Commissioner* v. *Bilder*, *supra* at 504.

The amount paid to Williams School was for the cost of education, meals and lodging, school uniforms (clothing), and incidental expenses for such items as laundry, cleaning, and school supplies. Such expenses on their face are personal, living, and family expenses. Section 262 of the 1954 Code provides that "Except as otherwise expressly provided in this chapter [Normal Taxes and Surtaxes], no deduction shall be allowed for personal, living, or family expenses." In *Carasso* v. *Commissioner*, 292 F. 2d 367, affirming 34 T.C. 1139, the Court of Appeals for the Second Circuit compared the wording of the predecessor provision in the 1939 Code, section 24(a) (which excepted "extraordinary medical expenses deductible under section

23 (x)" from the category of nondeductible personal, living, or family expenses), with the wording of section 262 (which does not make such exception); and the court also noted that a change had been made in the medical expense provision as it was enacted in the 1954 Code. See section 213 (e) (1) (B), which includes in the definition of "medical care" expense amounts paid "for transportation primarily for and essential to medical care referred to in subparagraph (A)." The court concluded (p. 369), that it was clear that by changing part of the predecessor medical expense provision, 23 (x), to the provision enacted as section 213 in the 1954 Code, the Congress intended "to prohibit deductions" of meals and lodging expenses, i.e., living expenses. The Supreme Court subsequently took the same view in *Commissioner* v. *Bilder*, *supra*, reversing 289 F. 2d 291 (C.A. 3, 1961). In the *Bilder* case, when it was before the Court of Appeals for the Third Circuit, Judge Hastie pointed out in his dissenting opinion (p. 308) (with the reasoning of which the Supreme Court in effect agreed) that the definition of "medical care" expense in section 213 (e) (1) (A) "says nothing about living expenses," and in his view the legislative history of section 213 showed "plainly that Congress did not intend to allow a deduction for living expenses."

The now extensive consideration of the general problem and the Supreme Court's decision in *Commissioner* v. *Bilder*, *supra* (decided April 30, 1962, which was after this Court's decision of *Martin J. Lichterman*, *supra*, and *Hobart J. Hendrick*, 35 T.C. 1223, 1235, Issue 4 (1961)), makes it abundantly clear that the provisions of section 213 (a) and (e) (1) (A) must be narrowly construed where the expenses for which deduction under that section are sought consist of expenditures that are conventionally understood to be personal, living, or family expenses; and that in considering whether such expenses can be classified as "medical care" expenses, the prohibition in section 262, that no deduction shall be allowed for personal, living, or family expenses *"Except as otherwise expressly provided in this chapter"* (italics added) certainly requires a narrow construction of section 213 (a) (1) (A).

We turn now to consideration of section 1.213–1 (e) (1) of the regulations promulgated under section 213 of the statute. In *Martin J. Lichterman*, *supra* at 596, this Court stated that it was of the opinion that "the regulations set forth reasonable rules to be applied in effectuating the statute." See *Commissioner* v. *South Texas Lumber Co.*, 333 U.S. 496. In the text of subparagraph (e) (1) of section 1.213–1 of the regulations there are statements of principles to which consideration must be given, and although subdivision (v) is pertinent to the question in this case, the following general provisions of (e) (1) are noted:

With respect to deductions, the following rule is stated in subdivision (ii):

Deductions for expenditures for medical care allowable under section 213 *will be confined strictly* to expenses incurred primarily for the prevention or alleviation of a physical or mental defect or illness. * * * an expenditure which is *merely beneficial to the general health* of an individual * * * is not an expenditure for medical care. [Italics added.]

With respect to the general definition of medical care, the regulation sets forth in subdivision (i) the principle that—

Expenses paid for "medical care" shall include those paid for the purpose of affecting any structure or function of the body, for accident or health insurance, or for transportation primarily for and essential to medical care.

In subdivision (ii) examples are given of items that are "medical care" expenses, namely, expenses of legal operations and treatments affecting any portion of the body; therapy or X-ray treatments; hospital and nursing services; medical, laboratory, surgical, dental, and other diagnostic and healing services; X-rays, medicines, and drugs; artificial teeth or limbs; and ambulance hire; and (in subdivision (v) (*a*) and (*b*)) the cost of inpatient hospital care (including the cost of meals and lodging therein).

Subdivision (iv) provides that under section 213(e)(1)(B) of the statute the clause relating to the allowable deduction for expense of "transportation primarily for and essential to medical care" shall not include "the cost of any meals and lodging while away from home receiving medical treatment," and that "if the travel is undertaken merely for the general improvement of a taxpayer's health, neither the cost of transportation nor the cost of meals and lodging would be deductible."

Subdivision (v) deals with amounts paid to an "institution" other than amounts paid to a hospital for inpatient hospital care (including the cost of meals and lodging in a hospital), and the following general principle is stated:

The extent to which expenses for care in an institution other than a hospital shall constitute medical care is *primarily a question of fact which depends upon the condition of the individual and the nature of the services he receives* (rather than the nature of the institution). A private establishment which is *regularly engaged in providing the types of care or services outlined in this subdivision* [(v)] *shall be considered an institution for purposes of the rules provided herein.* In general, the following rules will be applied: [Italics added.]

Subdivisions (*a*) and (*b*) of subdivision (v) prescribe two basic conditions under which amounts paid to an institution for the care provided and meals and lodging at the institution, and the cost of attending a special school and the meals and lodging at such school, will constitute "medical care" as defined in the statute. The conditions which must be satisfied are (1) the *availability* at the institution of

medical care "as defined in subdivisions (i) and (ii)," or the *availability* of resources of a special school for alleviating a mental or physical handicap of the individual, which are required because of the *condition* of the *individual;* and (2) the *availability* of medical care, or of particular resources for alleviating a handicap, *must be "a principal reason"* for the presence of the individual in the institution or special school.

It is clear in subdivisions (*a*) and (*b*) of subdivision (v) that the *condition* of the individual must be such that the availability of the particular care or resources of the institution or special school must be a *principal reason* for his presence there in order that the cost of meals and lodging furnished can constitute an expense for "medical care." Furthermore, if the institution is a special school which provides the means for alleviating a mental or physical handicap of the individual (his condition), the cost of attending the special school (constituting a medical care expense) will include "the cost of ordinary education" furnished only *if* the ordinary education "is incidental to the special services furnished by the school." (See fn. 2 *supra*, for the complete text of subdivision (v) (*a*) and (*b*).) But if the principal reason test is not satisfied, meals and lodging are not a cost of medical care, as the following states:

(*b*) Where an individual is in an institution, and his condition is such that the availability of medical care in such institution *is not a principal reason for his presence there*, only that part of the cost of care in the institution as is attributable to medical care (as defined in subdivisions (i) and (ii) of this subparagraph) shall be considered as a cost of medical care; *meals and lodging at the institution in such a case are not considered a cost of medical care* for purposes of this section. * * * [Italics added.]

Williams Military Academy is a boys preparatory school and elementary military academy. Its curriculum consists of the regular courses of study offered in any public school plus additional studies; physical education which includes football, baseball, basketball, swimming, and other sports in which all of the students must participate; and military training. The school's teams compete with private and public elementary schools during the various seasons. The courses of study qualify the students for entering any high school after graduating from Williams. The basic courses are in arithmetic, spelling, English grammar, planned reading assignments, history, and social science. Williams is an educational institution; it provides a general education (which is common and ordinary in the sense that the curriculum is standard and conventional) of a quality which is above the average and is not inferior. Colonel Williams, the head of the school, testified about the school and the substance of the essential part of his testimony is as follows: "Williams Military Academy is a boarding school for young boys seeking a good education." It has a positive program which re-

quires each boy to get his work done on the day of assignment; there is supervision in the study halls; the school is an accredited school under the requirements of the State of Illinois providing the required credits for entry after graduation in private or public high schools and other military schools; the school is operated under a system of regulations and discipline which gives all of the students something to be responsible for, which automatically regulates their day-to-day living and schedules. All students pay the same amount for attendance and within each class and grade receive the same instruction and program. Williams is not and does not hold itself out to be an institution which individuals attend principally to receive medical care; it does not have any medical program, general or special, as part of the curriculum; it is not equipped to deal with or alleviate unusual mental or emotional problems of the individual, and it does not have any special classes or courses for children who are either retarded, emotionally disturbed, or troubled with psychological or psychiatric problems. It does not have a doctor on its staff (although it has a doctor subject to call), and it only has a "practical nurse" on the staff and in attendance. All medical service and therapy, except minor attention, is the responsibility of the parents who must bear the cost. Williams testified, also, that petitioners' son, Andrew, took the same courses as the other cadets in his grade, and participated in the extracurricula activities.

Williams testified, further, that quite a few of the boys at his school come from home environments where they are maladjusted, as in situations where the parents are divorced or relatives living in the home contribute to making the environment unsatisfactory, but the only provision in the school for such maladjusted children is the system of rules, regulations, and discipline which applies to every individual attending the school, and "the emotional problems are mostly taken care of because they have something to do at all times."

Williams testified about petitioners' son, as follows: When Andrew went to Williams, he was a nonconformist, in that rules and regulations seemed to irritate him a little bit and he did not like to adhere to them; but it was not very long before he complied with all of the rules and regulations, he became a very good student, he became very stable, he "climbed the ladder," he was the musical director of the boys chorus at the graduation exercise, he did not cause any trouble, and he became a commissioned officer. Also, he did not have any major seizures of epileptic spells at the school.

The record indicates that although Andrew had infrequent epileptic spells his general health was good during 1961; there is not evidence to the contrary. He apparently passed the physical examination, and the tests given to ascertain the presence of contagious diseases evidently

were negative. He was given medication and treated by his own physician, Dr. Brown, at his office for his epileptic spells throughout the years he attended Williams, the charges for which were paid by his parents. Dr. Brown's medical care and charges were in no way connected or associated with the Williams School; i.e., the school did not call on him or refer Andrew to him. Dr. Brown had prescribed different and more medication for the epileptic condition than Andrew's previous doctor, beginning in January 1959, and he testified that by September 1959, when Andrew first entered Williams, the medication had been effective in reducing the spells and he was having fewer of them. The medical expenses for Dr. Brown's services during 1961 are not involved in the deduction claimed here.

Upon the evidence in this case, it must be concluded that the Williams Military Academy is neither an "institution" nor a "special school" within the provisions of subdivision (v) of subparagraph (e) (1) of section 1.213–1 of the regulations. Specifically, Williams is not an institution which is regularly engaged in providing medical care as defined in subdivisions (i) and (ii) of subparagraph (e) (1) of section 1.213–1 of the regulations (hereinafter called the pertinent regulation), and within the terms and provisions of section 213 (e) (1) (A) of the statute; and it is not a special school for retarded or mentally or physically handicapped individuals which has special treatment and training for alleviating and treating a mentally or physically handicapped individual within the provisions of the regulation and statute. Williams is a private boarding school for young boys where education and discipline are the primary and only resources. The ordinary education offered is not merely "incidental." Williams is not a school where special services and treatment are given for individuals having mental, physical, psychiatric, psychological, or emotional disturbances. Therefore, "availability of medical care" or of special resources for a handicapped individual was not "a principal reason" for Andrew's attendance at Williams.

Although the atmosphere, rules and regulations, discipline, and general routine of Williams, the association with other children, and the fact that it is a boarding school, were beneficial to Andrew, it cannot be concluded that those things constituted the furnishing of "medical care" by the school within the meaning of section 213 (e) (1) (A) and the pertinent regulation. It follows that the amount of $1,799 out of $1,824 paid to the school for Andrew's meals, lodging, uniforms, laundry, cleaning, supplies, and related incidentals (for which $1,500, $200, and at least $75 out of $100, respectively, were paid, plus an unexplained $24) did not constitute or represent expenses of "medical care" within the scope and intendment of section 213. Rather, the expenses totaling $1,799 were personal, living, and family expenses

which are not deductible under section 262, or under any other provision of chapter 1 of the 1954 Code.

Dr. Brown's testimony must be considered in connection with the whole record. It was not the epileptic condition that caused Dr. Brown's prescribing some private school. Rather, his reason was that a change of environment would help Andrew to overcome his poor adjustments in a public school and at home. If Andrew's parents could have exercised regularly the required discipline and the home environment had been satisfactory, it appears that Dr. Brown would not have recommended some private school. He does not do so in many cases of epileptic children. He testified that medication is the chief treatment for that condition, which must be taken regularly, and that while Andrew was at Williams, he did not take the prescribed medication regularly during the period September 1961 to June 1962, during which time he had three epileptic spells.

Andrew was having difficulties at the local public school and his behavior at home was uncooperative, but he was not an incorrigible child and Dr. Brown did not find him to be retarded or mentally ill. It is common knowledge that at various ages, some children are problem children, and that proper home environment and parental discipline furnish effective correctives. Andrew responded well, in a short time, to the regulations and discipline at Williams. However, the fact that his mental and emotional attitudes improved greatly at Williams and attendance there was generally beneficial does not serve to qualify the cost of sending Andrew to that school as medical care expense within the scope of section 213, since the only facilities there were those for providing education under a disciplined regime. See *L. Keever Stringham, supra* at 586, and *Hobart J. Hendrick, supra* at 1237–1238, where the cost of education at a private school was held not to be deductible as medical care expenses; Rev. Rul. 56–474, 1956–2 C.B. 157; and Rev. Rul. 58–280, 1958–1 C.B. 157, 158.

Petitioners' broad contention that the tuition cost is medical care expenses simply because Dr. Brown "prescribed" incurring that expense must be rejected. It is not supported by the provisions or legislative history of section 213. They do not cite any case or authority in support thereof. The Congress did not see fit to provide as a condition for a medical expense deduction the mere prescription by a doctor of some course of procedure regardless of the condition of the individual, the nature of the expense, and the primary and direct objectives thereof.

The petitioners have not shown error in respondent's disallowance of the claimed deduction to the extent of $1,799.

Petitioners are entitled to a deduction in some amount for the cost of the physical examination and minor medical care at Williams,

both of which come within section 213 of the pertinent regulation. Colonel Williams testified that part of $100 charged to each student is for the physical examination and minor medical care, but that there is no breakdown of this general charge. Applying the rule of *Cohan* v. *Commissioner*, 39 F. 2d 540, it is held that $25 is a reasonable amount for such medical expense, in the absence of proof of some other amount, and that petitioners are entitled to a deduction of $25 as medical care expense.

*Decision will be entered under Rule 50.*