George L. Armour and Frances Armour v. Commissioner.
Armour v. Commissioner
Docket No. 4737-67.
United States Tax Court
T.C. Memo 1969-245; 1969 Tax Ct. Memo LEXIS 50; 28 T.C.M. (CCH) 1268; T.C.M. (RIA) 69245; November 18, 1969, Filed Joseph Getz, for the petitioner. Wallace Musoff, for the respondent. DAWSON
Memorandum Findings of Fact and Opinion DAWSON, Judge: Respondent determined a deficiency of $2,833.36 in petitioners' Federal income tax for the year 1963. Petitioners have conceded some of the adjustments made by respondent. Two issues are presented for decision: (1) Are petitioners entitled to deduct transportation costs to Monte Carlo, France, and 1269 Phoenix, Arizona, as medical expenses under section 213, Internal Revenue Code of 1954? [1] (2) What was the fair market value of items of clothing, furniture and other *51 personal property contributed by petitioners to a charitable organization? Findings of Fact Some of the facts have been stipulated and are found accordingly. George L. Armour and Frances Armour (herein called petitioners) are husband and wife whose legal residence was New York City when they filed their petition in this proceeding. Petitioners filed their joint Federal income tax return for the year 1963 with the district director of internal revenue, Manhattan District, New York. On May 27, 1963, George L. Armour (herein called George) paid Air France $2,055.80 for round trip first-class air fare from New York to Nice, France, for himself and his wife. He also paid $24 for round trip transportation from the airport in Nice to Monte Carlo. On December 3, 1963, George paid American Airlines $519.97 for round trip first-class air fare from New York to Phoenix, Arizona, for himself and his wife. George suffered a severe heart attack sometime in 1958, and continues to suffer periodic attacks of angina. His heart is enlarged. Frances fell and broke her hip sometime in 1962. *52 She spent 21 months in a wheel chair and suffers considerable pain from arthritis. Dr. Harold E. Eiber, physician to the Armours, advised them in 1963 that a warm, dry climate would be more beneficial to their health than New York in the winter months. He also advised George to avoid the hot, muggy climate of New York in the summer. Dr. Eiber considered humidity and temperature extremes as harmful to George's heart condition. A warm, dry climate was beneficial to Frances' arthritis. Petitioners have regularly taken a summer vacation in Europe since 1925. For some years prior to 1958 it was their custom to spend part of the winter in Cuba. More recently they have spent their winters in Florida or Arizona. In 1963 petitioners took no vacation trips other than those to Monte Carlo and Phoenix. Prior to 1958, petitioners had spent the summer in Burgenstock, Switzerland. After George's heart attack, Dr. Eiber advised him to avoid the high altitude. George consulted doctors about his condition both in Monte Carlo and in Phoenix. In Monte Carlo and Phoenix the petitioners' social life was less hectic than usual. Still, they encountered dozens of friends in Monte Carlo, gave small *53 dinners once a month, and attended dinners given by others. Their activities in Arizona were more limited, consisting of casual cocktail parties and attending the movies five or six nights per week. George also played golf frequently. It was essential to George's well-being that he avoid the extremes of heat and cold in New York City. Phoenix was specifically beneficial to Frances' arthritis. It was not essential, however, for George to travel to Monte Carlo. To less affluent patients Dr. Eiber recommends Florida or the lower elevations of the Catskills, or at least an air conditioner. Petitioners "brought up the subject of Phoenix" and their doctors approved. The condition of Frances was not so severe that it required her being in Phoenix. Petitioners' New York City apartment is air conditioned. George retired in 1958. However, he maintained a business office in New York City in 1963. In 1963 petitioners gave numerous articles of clothing, furniture and other personal property to the Thrift Shop of the Irvington House for the Care of Children with Heart Disease, which is affiliated with the New York University Medical Center. The Thrift Shop furnishes donors with a written *54 appraisal of the value of the gifts it receives. The appraisals received by petitioners from the Thrift Shop totaled $4,801 in 1963. Mrs. Paul K. Sauer, director of the Thrift Shop for 20 years, personally appraised all but one of the items donated by petitioners. This particular item was a tweed coat lined in sealskin. Petitioners furnished Mrs. Sauer with a document, 1270 purporting to come from an independent appraiser, valuing the coat at $2,400. Mrs. Sauer "saw nothing untoward in the amount" and "accepted" the appraisal. All items received by the Thrift Shop are marked for sale at the appraisal figure. Mrs. Sauer does not bargain with donors over appraisal values. She did not discuss the values she placed on the items with the petitioners. Items are usually sold at the appraisal figure. Mrs. Sauer estimated that in nine out of ten times when an item sells for less, it is because of Breakage or shopwear. Sometimes an item sells for more than the appraisal figure. The Thrift Shop, under agreement with the Internal Revenue Service, keeps a record of the sale price of items appraised at figures exceeding $200. The coat involved herein sold for $1,875. The other items donated *55 by petitioners were not separately valued in excess of $200. Petitioners claimed as medical expenses under section 213 the cost of George's round trip fare to Monte Carlo and the round trip fares to Phoenix for both of them. They also claimed a charitable deduction under section 170 in the amount of $4,801. Respondent disallowed all of the transportation expenses as not being "primarily for and essential to medical care." He also disallowed $4,001 of the $4,801 claimed as charitable contributions, having determined that petitioners did not establish that the fair market value of the gifts exceeded the $800 allowed. Ultimate Findings 1. The petitioners' transportation costs were not "primarily for and essential to medical care." 2. The fair market value of petitioners' 1963 gifts of personal property to the Thrift Shop was $4,075. Opinion Section 213 permits the deduction of transportation expenses which are "primarily for and essential to medical care." Section 213(e)(1)(B). This provision clarified the case law regarding transportation costs developed under section 23(x) of the 1939 Code. H. Rept. No. 1337, 83d Cong., 2d Sess., p. A60 (1954); S. Rept. No. 1622, 83d Cong. *56 , 2d Sess., p. 219-220 (1954); see Commissioner v. Bilder, 369 U.S. 499, 501-502 (1962). At the same time, section 213 was intended to deny deductions for certain other "personal and living expenses incidental to medical treatment," which had been allowed under section 23(x). Commissioner v. Bilder, supra.
We acknowledge that the climatic conditions and ease of living prevalent in Monte Carlo and Phoenix aided the health and well-being of petitioners. But it is settled law that expenses generally beneficial to a taxpayer's health and well-being but permeated with personal considerations do not constitute "medical care" as defined in section 213(e)(1) and the regulations promulgated thereunder. Edward A. Havey, 12 T.C. 409 (1949); and H. Grant Atkinson, Jr., 44 T.C. 39 (1965). We reject petitioners' broad contention that the costs of transportation to Monte Carlo and Phoenix were primarily for medical care simply because Dr. Eiber advised and recommended such trips. H. Grant Atkinson, Jr., supra at p. 54. Petitioners point out in their brief that Dr. Eiber "gave consideration to the patient as a 'whole human being' *57 and in this viewpoint he considered of equal importance, the mental as well as the physical status of the patient." From this we infer that the expenses incurred by petitioners in traveling to Monte Carlo and Phoenix were for the general improvement of their health. Section 1.213-1(e)(1)(iv), Income Tax Regs., provides that the cost of "travel * * * undertaken merely for the general improvement of a taxpayer's health" is not deductible. We do not doubt that the trip to Monte Carlo was beneficial to George's heart condition, or that Phoenix was beneficial to the respective ailments of both petitioners. However, it was petitioners' custom for many years to take a summer vacation in Europe and a winter vacation in a warm climate. The trips to Monte Carlo and Phoenix appear to be merely a continuation of that custom. We fail to see how the decision to go to Monte Carlo and Phoenix, even if partly medically motivated, can change what would normally be personal expenses into medical expenses. Where there is such a coincidence of personal and medical reasons, this Court has generally refused to find that the trip was "primarily for and essential to medical care. *58 " See Frances Hoffman, 17 T.C. 1380 (1952); Edward A. Havey, supra.This is simply 1271 a case of "vacations" modified by medical overtones. Petitioners have not shown that there was any business need for them to live in New York City or that their semi-annual trips to and from New York City were predominantly taken for medical reasons. Our view of the evidence is that petitioners' trips to Monte Carlo and Phoenix were primarily vacations taken as part of their long-standing pattern of living. The facts herein are closely parallel to those in Bertha M. Rodgers, 25 T.C. 254(1955), affirmed 241 F. 2d 552 (C.A. 8, 1957), and we think the principles of that case are dispositive of this issue. Accordingly, we hold that the transportation costs of petitioners were not "primarily for and essential to medical care," but constituted nondeductible personal expenses. With respect to petitioners' gifts to the Thrift Shop, we accept for the most part the accuracy of the values assigned to the various items appraised by Mrs. Sauer. She was a candid and impressive witness. She is an expert in her field. We believe her testimony that most *59 of the items sold for their appraised values. An exception was the seal lined tweed coat. We understand Mrs. Sauer's testimony and the reference to petitioners' appraiser in her report as indicating that she did not make an independent appraisal of the coat. Her statement that there was nothing "untoward" in the amount shows that she regarded the coat as a valuable one, but that she had not attempted to assign it a specific value. Since neither the original appraisal nor its preparer was available at the trial, we regard the sales price ($1,875) of the coat as the most reliable evidence of its value under these particular circumstances. Therefore, we have found that the fair market value of the coat was $1,875, rather than $2,400, when it was given to the Thrift Shop and that the fair market value of the other items was $2,200. All of the personal property contributed to the Thrift Shop had a total fair market value of $4,075, as reflected in our ultimate finding of fact. See Daniel S. McGuire, 44 T.C. 801 (1965), and the cases cited and discussed therein. Decision will be entered under Rule 50. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954 unless otherwise indicated.↩