John R. TUTTLE and Louise B. Tuttle,
Plaintiffs-Appellees,

v.

UNITED STATES of America,
Defendant-Appellant.

No. 46, Docket 34214.

United States Court of Appeals,
Second Circuit.

Argued Oct. 8, 1970.

Decided Dec. 29, 1970.

Benjamin M. Parker, Atty., Dept. of Justice, Washington, D. C. (Johnnie M. Walters, Asst. Atty. Gen., Lee A. Jackson and Crombie J. D. Garrett, Attys., Dept. of Justice, Washington, D. C., of counsel; James M. Sullivan, Jr., U. S. Atty., N. D. N. Y., Syracuse, N. Y., and Samuel T. Betts, III, Asst. U. S. Atty., on the brief), for defendant-appellant.

Caleb Candee Brown, Jr., Syracuse, N. Y., for plaintiffs-appellees.

Before MOORE, SMITH and ANDERSON, Circuit Judges.

MOORE, Circuit Judge:

Plaintiffs (appellees) seek a determination that they were entitled to deduct from their Federal income tax return for the taxable year 1964 the replacement value of a life insurance policy which was given by them to a charitable institution, which amount was stipulated to be $4,000.67. Accordingly, plaintiffs seek a tax refund of $2,081.56.

Plaintiffs' son, Forbes S. Tuttle, on the dates relevant to the issues herein, was the general agent of the Massachusetts Mutual Life Insurance Company in Syracuse, New York. On May 28, 1952, he purchased a policy on his life, having a face value of $50,000. On August 15, 1963, he donated the policy to St. Anne's Church, also in Syracuse. By that date, the policy had become "a paid up policy" with a face value (including paid-up additions) of $56,654. Thus no further premiums would ever be due on the policy. On September 4, 1963, about three weeks later, plaintiffs purchased the policy from St. Anne's for $1,000. On April 13, 1964, plaintiffs donated the policy to the Community Foundation of Syracuse and Onondaga County, Inc., a charitable organization. On April 28, 1964, the policy anniversary date, that organization surrendered the policy to the insured for its then cash value of $771.53. Each of these transfers was made subject to a large loan against the policy, the amount of which loan was constantly increasing. The following table indicates, for each of the four relevant dates, the

face amount of the policy, the amount of the loan outstanding, the cash surrender value and the replacement value, as stipulated by the parties.

| Date | Face Amount of Policy Including Additions | Amount of Loan Including Accrued Interest | Cash Surrender Value | Replacement Value |
|------|------|------|------|------|
| August 15, 1963 | $56,654 | $34,814.27 | $920.24 | $4,314.95 |
| September 4, 1963 | 56,654 | 34,906.14 | 892.30 | 4,223.08 |
| April 13, 1964 | 56,654 | 35,964.76 | 283.60 | 4,000.67 |
| April 28, 1964 | 57,428 | 36,037.14 | 771.53 | N/A |

Under § 170 of the Internal Revenue Code of 1954, the deduction available for donations other than money is the "fair market value of the property at the time of the contribution." Treas.Reg. 1.170–1(c).[1] The task we are confronted with here is the application of that principle to the valuation of a paid-up life insurance policy which is subject to a substantial loan.

As the above table suggests, there are three principal indicia of value in the case of a paid-up life insurance policy. The replacement value is the amount which the issuer would charge to issue an identical policy to a person of the same age as the insured.[2] The cash surrender value is the amount the insurance company is willing to pay in the event the policy is surrendered. The potential net death benefit is the amount which the beneficiary would receive if the insured died immediately which would be the difference between the face amount and the loan outstanding. The potential net death benefit would be relevant only where special circumstances suggest that because of ill health the insured's death was imminent. Thus, the usual task is to choose between replacement value and cash value, or some intermediate figure. That choice depends on the circumstances of the case.

Treas.Reg. 25.2512–6(a), Example 3, prescribes replacement value as the appropriate method for valuing a paid-up life insurance policy for the purposes of the gift tax. This regulation is supported by three Supreme Court cases which

[1]. Section 170(a) (1) states the "general rule":

"There shall be allowed as a deduction any charitable contribution * * * payment of which is made within the taxable year. * * * "

[2]. As the District Court indicated, an examination of the figures as stipulated and set forth in the chart suggests that replacement value here was computed by taking the replacement value of the policy without considering the loan, and then subtracting from such replacement value the amount of the loan. Thus from August 15th to September 4th, the decrease in the replacement value was exactly equal to the increase in the loan. Of course, at some specific date during the year, the insured, Forbes Tuttle, would be considered one year older for insurance purposes, and the replacement cost of the policy would go up. From September 4th to April 15th, the decrease in the replacement value occasioned by the increase in the loan was presumably offset by the increase in the replacement value attributable to the increase in the age of the person whose life was insured.

preceded its adoption.[3] Replacement value is appropriate in the gift tax context for several reasons. Essentially, a conclusion that replacement value is the best indication of fair market value implies that there is at least one person who would be interested in holding the policy as an investment, thus taking the policy in the expectation at some future time of receiving the death benefit provided for in the policy. Cash surrender value is the more appropriate valuation when it appears that no one is interested in keeping the policy in effect and that anyone receiving the policy would be likely to surrender it to the company for the cash surrender value. In the gift tax context, it would almost always be the case that the person receiving the policy has an insurable interest in the life of the person being insured, and such person might possibly have invested in such a policy himself had he not received one as a gift. Often the person to whom the policy is transferred is the beneficiary before as well as after the transfer. A typical transfer would be from a father to his child or from a husband to his wife. In such circumstance, it would be presumed that the beneficiary would hold the policy in the expectation of eventually receiving the death benefit under the policy.[4] Thus, in the gift tax context, replacement value usually reflects the actual value of the policy.

The gift tax valuation rule, however, does not carry over into the valuation of life insurance policies for the purposes of the income tax; circumstances may indicate that a means of valuation other than replacement value is proper. Gravois Planing Mill Company v. Commissioner of Internal Revenue, 299 F.2d 199, 210, 211 (8th Cir. 1962) (Blackmun, J.); In re Hygrade Envelope, 272 F.Supp. 451, 461 (E.D.N.Y.1967), rev'd on other grounds, 393 F.2d 60 (2d Cir. 1968).

An examination of all the factors involved here leads us to conclude that the cash surrender value was the basic element of value in this policy, and we conclude that the most appropriate valuation is the cash value of the policy on the date it was surrendered.

In the very case which established the general rule in gift tax cases that replacement value is the proper means of valuing paid-up life insurance contracts, the Supreme Court arrived at this conclusion because the policies had been recently purchased from the insurer and "cost is cogent evidence of value." Guggenheim v. Rasquin, *supra*, 312 U.S. at 256–258, 61 S.Ct. at 509. Here the cost to the plaintiffs was $1,000, just slightly more than the cash surrender value at the time of their purchase, and there was "no substantial evidence that any situation arose or development occurred in the interim [of seven months between purchase and gift] which increased the value of the [policy]." Tripp v. Commissioner of Internal Revenue, 337 F.2d 432, 434 (7th Cir. 1964).

Although the highest price actually offered for a particular asset is not necessarily the highest figure at which the asset could properly be valued, the value

3. Guggenheim v. Rasquin, 312 U.S. 254, 61 S.Ct. 507, 85 L.Ed. 813 (1941); Powers v. Commissioner of Internal Revenue, 312 U.S. 259, 61 S.Ct. 509, 85 L. Ed. 817 (1941); United States v. Ryerson, 312 U.S. 260, 61 S.Ct. 479, 85 L.Ed. 819 (1941). There is a similar regulation applicable to transfers under the estate tax. See Treas.Reg. 20.2031–8, Example 2.

4. An examination of the cases cited in note 3 will show that there had developed a technique of estate planning which involved the *inter vivos* transfer of life insurance policies. This resulted in the transfer being taxed at the lower gift tax rate rather than under the estate tax, and while a transfer at death would result in having the entire death benefit taxed under the estate tax, only a portion of such benefit would be taxed when the transfer was *inter vivos*. Although the technique clearly contemplated that the policies would be held for investment by the donee, and in *Rasquin, supra*, the purchase and gift of the policy were almost simultaneous, the taxpayers hoped that the policies would be valued at cash surrender value. The cases recognized that under the circumstances such a valuation was unrealistically low.

of the asset to the donee may be relevant and helpful in determining the fair market value. Compare Daniel S. McGuire, 44 T.C. 801 (1965) with George L. Armour, 28 T.C.M. 1268 (1969). As the Court said in *Rasquin, supra,* 312 U.S. at 257, 61 S.Ct. at 509, "[i]n this situation as in others (Susquehanna Power Co. v. State Tax Commission, 283 U.S. 291, 296, 51 S.Ct. 434, 436, 75 L.Ed. 1042) an important element in the value of the property is the use to which it may be put." As has been suggested, where no one is interested in maintaining a life insurance policy as an investment, the cash surrender value becomes the significant criterion of value. Apparently, the Community Foundation had no intention of holding the policy for the duration of the insured's life. That the policy was in fact surrendered by the Community Foundation soon after receipt, is very strong evidence of this. Cf. London Shoe Company v. Commissioner of Internal Revenue, 80 F.2d 230, 233 (2d Cir. 1935), cert. denied 298 U.S. 663, 56 S.Ct. 747, 80 L.Ed. 1388 (1936). The action of the Community Foundation was reasonably predictable. It was predictable because the Community Foundation, unlike the usual donee in the gift tax situation, had no relation to the insured (plaintiffs' son). Therefore, it would not be expected to maintain the policy in effect. There are almost never more than a handful of persons who would potentially be interested in holding a paid-up life insurance policy for investment. Where the donee is such a person, it may be justifiable to assume that he will keep the policy for investment, and thereby possibly require the use of replacement value as the appropriate means of valuation. But here, the donee had no insurable interest in the insured and probably would not have purchased a policy on his life.

Furthermore, there was a substantial loan on this policy and an examination of the figures as summarized in the above chart suggests that because of such loan and the interest accruing thereon, there was an annual net decrease in the cash surrender value of the policy, which decrease would have resulted in the lapse of the policy in a relatively short time assuming no payments were made to reduce the loan. Even to take advantage of what period of coverage remained apparently would have meant the obliteration of the remaining cash surrender value. Because of this, it was not likely that any donee unrelated to the Tuttle family would have held the policy as an investment.

Thus, the cash surrender value is the appropriate means of valuation in this case both because the plaintiffs' cost approximated cash value and because the evidence shows that no one was or could have been expected to be interested in holding the policy as an investment. However, the market value at the time of the gift would have taken into account the increase in cash surrender value which was to accrue fifteen days later on the policy anniversary date. We, therefore, find that the deduction which is properly allowable is $771.53, the cash surrender value at the time of surrender.

The judgment of the District Court is reversed and remanded with instructions to enter judgment based upon a tax computation in accordance with this opinion. No costs.