ALVIN J. SIMS and PEARL R. SIMS, Petitioners v. COMMISSIONER OR INTERNAL REVENUE, Respondent.
Sims v. Commissioner
Docket No. 822-78.
United States Tax Court
T.C. Memo 1979-499; 1979 Tax Ct. Memo LEXIS 26; 39 T.C.M. (CCH) 700; T.C.M. (RIA) 79499; December 13, 1979, Filed Richard G. Maloney, for the petitioners. Charles W. Maurer, Jr., for the respondent. RAUM
MEMORANDUM FINDINGS OF FACT AND OPINION RAUM, Judge: The Commissioner has determined a $3,516.34 deficiency in petitioner's 1975 income tax. As a result of agreement between the parties, there remains in issue only a medical deduction claimed by petitioners in respect of the private school expenses paid for the benefit of their son David. FINDINGS OF *27 FACT Various facts have been stipulated, and the stipulation and related exhibits are hereby incorporated in these findings by reference. Petitioners, husband and wife, were residents of Brockton, Massachusetts, at the time their petition was filed. They are the parents of two sons, Howard William (Bill), born in 1957, and David, born May 4, 1960. Bill was a very competent boy who at times has been a student at private schools. David has presented more difficult problems for his parents. David attended the Brockton public schools through 1972 for the first through the sixth grades. He first under-went psychological testing at age nine in April 1970, on the recommendation of Dr. Michael C. Randon, the Sims' family physician. These tests, which were conducted under the auspices of the Brockton Public schools, produced no conclusive scores because of David's high anxiety, and "negative self-worth and inferiority". More tests were administered in June of 1971 when David was 11. The tests were administered by Franklin Stein, Ph.D., a certified psychologist. Dr. Stein concluded that David had the potential to learn at a normal rate, but that his ability to attend to sensory *28 information was disturbed. Dr. Stein found Divid's greatest problem to be impulsivity; his problems of attention and concentration indicated that Divid retained little of what he heard. Dr. Stein noted that David showed normal abstract thinking, which suggested that he was a "self-learner" unresponsive to formal academic learning. Problems of proportionality, muscle coordination, and an underlying aggressiveness, counterbalanced by fear, were also observed by Dr. Stein. Therapy was recommended. David was in therapy with Dale Van Meter, of Family and Personal Counselling, Inc., from May of 1970 until February of 1972. David was described as impulsive, physically hyperactive, fantasizing, plagued by low self-esteem and troubled by sibling rivalry with his older brother Bill, although David's fantasizing evidently decreased as therapy progressed. Mr. Van Meter did note that David was not self-destructive in his inability to control his impulses. When David was in the sixth grade, his parents were informed that he was not emotionally or educationally able to continue in the public schools for the seventh grade. School officials suggested he be given a complete neurological and *29 phychological examination. An examination was given in March of 1972 at Massachusetts General Hospital by Drs. Penelope Garrison and Mary Louise Scholl. David was found to have a "minimal defect in fine motor coordination",     low self-esteem, and a failure pattern. His I.Q. was characterized as difficult to assess because of proof testing performance, but the Doctors concluded that it was without doubt, less than other family members. Private school, where David would not have to compete with other children, and where he would use his artistic and athletic abilities, was recommended. Consultations with a child psychiatrist experienced in dealing with underachieving children were also suggested. In April of 1972, David was examined by Jose Delgado, M.D. Dr. Delgado completed a child psychiatrist's report on David entitled "Report of Emotionally Disturbed Child". He characterized David's problem as psychiatric, in particular an "overanxious reaction of childhood." Symptoms of pervasive anxiety, excessive fantasy, obsessive - compulsive trends, insecurity, undue acquiescence and approval-seeking, and under-achievement were noted. Special education was recommended, as well *30 as continued psychotherapy. The report form filled out by Dr. Delgado was for use by the Commonwealth of Massachusetts in providing assistance to moderately or severely disturbed children unable to profit from regular classroom instruction. However, both David's therapist and the doctors at Massachusetts General Hospital had recommended that he be placed in a setting as close as possible to a normal school situation -- not a school dealing solely with children with severe physical or learning disabilities. The principal of David's elementary school advised David's parents that the latter type of placement would be likely to result from participation in the Massachusetts program, and it was suggested that participation would adversely stigmatize David. Accordingly, petitioners did not apply for participation in the Massachusetts program. David was a boarding student at the Fay School, Southboro, Massachusetts, from September, 1972, to June, 1973, repeating the sixth grade. During this time, he was in psychotherapy twice weekly with William Rothney, M.D. However, in the view of petitioners, the Fay School did not provide sufficient individual attention to David, and the school *31 did not adequately integrate its teaching efforts with the psychotherapy David received from Dr. Rothney. As a result, and in view of dissatisfaction of Fay School with David's progress there, petitioners began searching for another school. David attended the Fessenden School, West Newton, Massachusetts, as a boarding student from September, 1973, to June, 1975. He was in the seventh and eighth grades at the Fessenden School. The Fessenden School, founded in 1903, is an accredited boarding and day school for boys in the first through ninth grades. Enrollment is approximately 300 boys; in 1975, there were 130 boarding students and 165 day students. Through grade six, most students take the same courses. In the upper grades, studies in history, mathematics, and English continue, and students choose between languages and sciences to round out the curriculum. Each boy has an individually planned schedule, based on his prior record and recommendations of those familiar with his progress. In 1975, the faculty numbered 43. The average class size is 12 to 13 students. The curriculum is designed to propare students for admission to independent boarding schools at the ninth or *32 tenth grade level. Most of the students at Fessenden are "bright" and "high achieving". However, the school has made it a policy to accept some students who require special help because of problems in the learning process. These students make up approximately 12 to 15 percent of the student body. This policy is not publicized in the Fessenden brochures made part of the record. Fessenden has a learning center to assist students with learning disabilities, and approximately 30 to 35 students, including David, utilized this center in 1975. The availability of the learning center is mentioned in Fessenden's promotional literature. In 1975, the learning center was directed by Ms. Maria Orlow and staffed by three other persons. The learning center staff is specially trained to work with children with learning disabilities. Students requiring the services of the learning center generally are there one hour per day. The remainder of their school day is spent in regular classroom situations. The teachers at Fessenden are also available to provide special help to students one period per day. There is no extra charge for this assistance. However, there is an extra charge for use *33 of the learning center. In 1975, petitioners paid $1,052 in charges for David's use of the learning center. In 1975, Fessenden had on its staff a licensed psychologist, Dr. Clampit. Dr. Clampit is salaried by the school and resides on the campus. Dr. Clampit provides psychological services to students and advises the headmaster.Dr. Clampit's office was in the learning center, and he regularly saw about ten students. Dr. Clampit handled emotional problems encountered by students with learning disabilities, and he also dealt with psychological problems of boys not connected with the learning center, such as boys having difficulty dealing with a divorce in the family. Special counselling sessions and psychological services resulted in extra charges. Counselling is not a regular part of the school curriculum, although it may be suggested by school officials; the availability of psychological assistance is not promoted by the school in publications, but the availability of the services is disclosed to parents who ask during the admission process. Two charges for Dr. Clampit's services were paid by petitioners in 1975 on David's behalf; the charges totaled $108. However, Dr. Clampit *34 did not make charges for impromptu meetings with students on an informal basis; office visits of 10 to 15 minutes in length did not result in charges. Dr. Clampit saw David on average more often than twice a month for therapy during the 1974-1975 school year at Fessenden. David was admitted to Fessenden only after school officials spoke with petitioners and Dr. Rothney; testing of David by Maria Orlow was also required. School officials were made aware of David's emotional and learning problems, and Ms. Orlow recommended that he not be accepted unless the school could concentrate a great deal of attention on him. Petitioners found Fessenden a satisfactory school because they believed it provided strong support in the academic area interlaced with continued psychological assistance. During the 1974-1975 school year, David took courses in English, mathematics, American history, and physical science. He also participated in basketball, football, track, woodworking, and the art club. He received additional tutoring in mathematics during 1975. He successfully completed all courses except English. As a result of his failure to complete the English course, he did not receive *35 a Fessenden diploma. Fessenden School started its ninth grade program the accademic year after David finished grade eight. However, the program was directed more toward students with records of academic excellence, and petitioners were obliged to search for another school for David. After David was rejected by the Forman School in Connecticut because of his past psychiatric treatment, petitioners investigated Chapel Hill-Chauncy Hall School. After finding that the school had a learning center and could provide small classes and academic and psychological support for David, they enrolled him. David attended the Chapel Hill-Chauncy Hall School, Waltham, Massachusetts, as a boarding student from September 1975 to June 1977. David was in the ninth and tenth grades at the school. Chapel Hill-Chauncy Hall School is an accredited coeducational boarding and day school for the ninth through twelfth grades. In 1975, approximately 120 students were enrolled at the school.Required courses for graduation include four years of English; two years of mathemetics, sciences, and human movement; one year of social sciences, United States history, and fine arts; and six electives. Class *36 size ranges from 10 to 12 students, and student schedules are planned to reflect the particular abilities of the individual student. There are approximately 20 faculty members. Chapel Hill-Chauncy Hall is oriented toward sending graduates on to colleges. Approximately 90 to 95 percent of the students continue their education after graduation. However, approximately 25 to 30 percent of the students have "learning disabilities". To assist students with such problems, the school maintains a learning center. The learning center also performs testing functions and assists students in improving reading and study skills. In dealing with students with learning problems, the center attempts to determine the extent of the discrepancy between student capacity and performance, and then proceeds to develop a process by which the student can learn. The learning center is prominently featured in promotional material published by Chapel Hill-Chauncy Hall. However, the school does not advertise in catalogs for schools which deal exclusively with students with learning disabilities. In 1975, the staff of the learning center consisted of one person, Dr. Roberts M. Houghton, who obtained her *37 Ph.D. degree from Boston University in learning disabilities. David received assistance from the learning center while he was at Chapel Hill-Chauncy Hall. Separate charges of $200 per term are made for the services of the learning center. However, petitioners paid only $20 to the school during 1975 after receipt of a bill for the learning center. The balance of the charges was not paid until January of 1976. Chapel Hill-Chauncy Hall offers an on-campus counselling program. In 1975, it was staffed by Dr. James Hreschko of Powell Associates, Counselors in Psychology and Education, of Cambridge, Massachusetts. Dr. Hreschko, a psychologist, came to the school once a week to consult with individual students. Counselling is not a regular part of the school corriculum, although some students are accepted on the condition that they receive counselling. Approximately 10 to 12 students regularly receive counselling. There is an extra charge for such services, which was $500 in 1975. David was required to receive counselling as a condition of his admission to Chapel Hill-Chauncy Hall, and petitioners paid $500 for such services in 1975. Chapel Hill-Chauncy Hall School received a number *38 of communications about David prior to the time he began school there. David's headmaster at Fessenden, Mr. Robert P.T. Coffin, Jr., noted that David had learning problems and was "something of a special student at Fessenden". He suggested that any school he attended should have a learning center. Information on David's participation in "A Unique Approach to Learning Disabilities", a summer program run by the Proctor Academy in Andover, New Hampshire, was also received by Chapel Hill-Chauncy Hall. Dr. Clampit also communicated with the school, reporting that David was growing out of his immaturity but occasionally lapsed into childish behavior. David was characterized as "very immature, not very socially perceptive, with a low self-esteem, and low tolerance for frustration". Dr. Clampit did not feel that David required depth psychotherapy or sympathy and support; rather, David required therapy, providing consistent feedback about his behavior and how it affects others. In resporting on tests administered to David, Dr. Clampit noted that David's scores were depressed by an immature style that was emotionally, and not cognitively, based. He noted that his scores reflected undeveloped *39 potential. However, the assistant headmaster, Mr. J. Gaston Faverau, concluded that the school had sufficient resources to meet David's problems. David successfully completed all courses, except one on health, at Chapel Hill-Chauncy Hall for two academic years, although he never received grades higher than a "C". However, at the end of the second year, he was asked not to return for the next year. The faculty voted in March of 1977 to advise David that improvement was required in his behavior if he was to be invited to return. Specific problem areas noted were disruptive interferences with the rights of others, insubordination and refusal to obey instructions, lying, and shoplifting. David was ultimately dismissed in June. Reasons cited were David's inability to take criticism from teachers and his lack of interest in academic life. Another factor was the lack of suitable upper-level courses for David for the next two years. Although David's academic and behavioral problems were both considered in the decision to dismiss him, he probably would have been allowed to continue at the school on the basis of his academic record if there had not also been emotional problems present. *40 At the time of the trial of this case, David was attending Winchendon School, in Winchendon, Massachusetts, from which he was expected to graduate in the fall of 1979. David also had been admitted to American International College in Springfield, Massachusetts. On their timely filed 1975 individual income tax return, petitioners claimed medical expense deductions in respect of payments to Fessenden School of $1,638.42 and payments to Chapel Hill of $4,155. In his notice of deficiency the Commissioner disallowed all claimed deductions, except for $141.70 representing medical insurance premiums. [1] At trial, petitioners were allowed to amend their petition to claim $4,475.96 in payments to Fessenden School and $3,945 in payments to Chapel Hill-Chauncy Hall School. These payments were properly shown by the record to have been made in 1975 to the payees as claimed. However, the characterization of the total of these payments as medical expenses is in issue in this case. *41 OPINION Expenditures by parents for the education of their children are generally regarded as "personal, living, or family expenses"which are not deductible. Section 262, Internal Revenue Code of 1954. See Brown v. Commissioner,62 T.C. 551, 555-556 (1974), affd. 523 F. 2d 365 (8th Cir. 1975); Gruwald v. Commissioner,51 T.C. 108, 115 (1968). Cf. Lewis v. Commissioner,8 T.C. 770, 775-776, affd. 164 F.2d 885 (2d Cir. 1947). See also section 1.262-1(b)(9), Income Tax Regs. However, section 213, I.R.C. 1954, allows a limited deduction of payments for "medical care", which is broadly defined in the statute to include the treatment or mitigation of diseases affecting the structure or function of the body. [2] Educational services to persons with mental or physicial handicaps or diseases can sometimes qualify as medical expenses if they meet the conditions set forth in the regulations. [3] The regulations have been held to be consistent *42 with the statute. Lichterman v. Commissioner,37 T.C. 586, 596 (1961). *43 The regulations indicate that the extent to which payments to institutions other than hospitals will be deemed to be payments for medical care is a question of fact depending on the condition of the individual and the nature of the services he received there. Section 1.213-1(e)(1)(v), Income Tax Regs, supra note 3. As a general rule, if an individual undergoes treatment at an institution, and a principal reason for his presence there is the availability of medical care, then meals and lodging furnished at the institution "while the individual requires continual care" will be considered expenses for medical care. Thus, the costs of institutional care for mentally ill persons unsafe when left alone are fully deductible. Also, expenditures for attendance at a "special school" for the mentally or physically handicapped are deductible if the institutional resources for the alleviation and treatment of the handicap are a principal reason for the person's attendance. Included *44 as deductible expenses for attending such an institution are the costs of meals and lodging and ordinary educational services which are "incidental" to the school's special services for the handicapped person. Section 1.213-1(e)(1)(v)(a), Income Tax Regs., supra note 3. See Atkinson v. Commissioner,44 T.C. 39, 50-54 (1965). Cf. Fischer v. Commissioner,50 T.C. 164, 175-176 (1968). However, if the medical care offered at an institution is not a principal reason for an individual's residence there, then only the costs of medical services rendered are deductible; meals and lodging and related custodial services are not deductible. Section 1.213-1(e)(1)(v)(b), Income Tax Regs., supra note 3. Petitioners contend that both Fessenden and Chapel Hill-Chauncy Hall are "special schools" within the meaning of the regulations. They contend that both schools had resources to help mentally handicapped individuals, and that such resources provided petitioners' principal reason for sending David to the schools. Accordingly, petitioners claim deductions for all payments made to Fessenden and Chapel *45 Hill-Chauncy Hall. In the alternative, they argue that even if the schools do not qualify as "special schools", petitioners are still entitled to deductions for payments of psychological counselling and learning center charges, as these were expenditures directly for "medical care". The respondent contends that neither Fessenden nor Chapel Hill-Chauncy Hall are "special schools". He views both schools as ordinary private schools that deal with normal children; the special psychological counselling and learning centers available at both schools are characterized as merely incidental to the educational services of the schools.Also, services provided by the learning centers at both schools are viewed as educational services ("tutorial"), and not medical services. Accordingly, the respondent would allow petitioners deductions only for amounts paid directly for psychological services. [4]
*46 Although we are keenly and sympathetically aware of the anguish suffered by petitioners in respect of David's problems, we are compelled to find that neither Fessenden nor Chapel Hill-Chauncy Hall qualified as a "special school". Accordingly, petitioners may not deduct all of their expenditures to maintain David at the schools as medical expenses. The determination as to whether particular services are "medical care", and thus as to whether a school is a special school, is made with reference to the nature of the services received by the individual, not with reference to the general nature of the institution as a whole. See Fischer v. Commissioner,supra,50 T.C. at 174 and n. 7. See generally Estate of Baer v. Commissioner,26 T.C.M. 170, ol P-H Memo. T.C. par. 67,034 (1967). Although Fessenden and Chapel Hill-Chauncy Hall serve a student population composed largely of "normal" students and offer traditional educational programs, this does not preclude a finding that they are "special schools" for students with special needs. There is no requirement in the regulations that a "special school" admit only students that are suffering *47 from a mental or physical disease or defect.Indeed, the Commissioner has so ruled. See Rev. Rul. 70-285, 1970-1 C.B. 52, 53. We cannot find that Fessenden and Chapel Hill-Chauncy Hall are "special schools". This Court has rarely allowed a medical expense deduction for the full cost of a private school education. Although the individual attention, small class size, and strict discipline characteristic of good private schools often are beneficial to students suffering from mental or physicial defendants or illnesses, the cost of a basic education is still primarily a personal expense, and it does not become a medical expense merely because it is prescribed by a physician. If a private school provides no special services beyond the ordinary educational program offered as a part of its regular curriculum, then the cost of attending the school is not deductible, not-withstanding that attendance may help alleviate a student's mental or physical defect or disease. Pfeifer v. Commissioner,     F.2d    , 79-2 USTC 87,857, 87,858-87,859 (10th Cir., July 10, 1979), *48 affg. a Memorandum Opinion of this Court. See Martin v. Commissioner,548 F. 2d 633, 634 (6th Cir. 1977), affg. a Memorandum Opinion of this Court; Ripple v. Commissioner,54 T.C. 1442, 1447-1448 (1970); Grunwald v. Commissioner,supra,51 T.C. at 113-115; Atkinson v. Commissioner,supra,44 T.C. at 51-54; Lichterman v. Commissioner,supra,37 T.C. at 596-597. And even where the school does provide a number of special services to alleviate the effects of the student's mental or physical handicaps, if substantial educational services are provided above and beyond those rendered as incidental to the special services required by the student, it may not qualify as a special school; but the cost of the special medical services provided may be deducted as a medical expense. Sec. 1.213-1(e)(v)(a), Income Tax Regs., supra note 3. See Fischer v. Commissioner,supra,50 T.C. at 175-176. Cf. Hendrick v. Commissioner,35 T.C. 1223, 1236-1238 (1961); Estate of Baer v. Commissioner,supra,26 T.C.M. at 173, *49 36 P-H Memo. M.C. at 188 (1967). [5]A school will qualify as a "special school" only if (1) its resources for alleviating or treating a mental or physical handicap are a principal reason for the student's presence at the school, and (2) the educational services provided are rendered only as an incident to providing medical care. See Greisdorf v. Commissioner, 54 T.C. 1684, 1689 (1970). Cf. Martin v. Commissioner, supra, 548 F. 2d at 634. *50 We cannot, on the basis of the record, conclude that the ordinary educational services David received at Fessenden and Chapel Hill-Chauncy Hall were merely "incidental" to the special services he received. At Fessenden, in the winter and spring terms of 1974-1975, David received regular classroom instruction in English, mathematics, American history, and physical science, successfully completing all of these courses except English. David also participated in basketball, football, track, woodworking, and the art club during 1974-1975. He received individual instruction in mathematics after February, but this service was rendered at no extra charge to petitioners, and such services were available to any student having difficulty with the academic material in a particular class. Although David appears to have spent substantial time receiving assistance at the Fessenden learning center, it is clear that the regular classroom instruction and extracurricular activities were not merely incidental to the special services he received. The same situation prevailed at Chapel Hill-Chauncy Hall. During the year in issue, David took courses in English, art, general mathematics, introductory *51 physical science, and human movement, successfully completing all of them. David also utilized the services of the learning center, for which special charges were made, and received a passing grade for his work there. In addition, he met with a psychologist once a week, and special charges were made for this service. However, it is clear that most of the services he received at the school were in the form of ordinary classroom instruction no different from the instruction received by other students. We cannot view these educational services as merely incidental to the special services David received.
The fact that neither Fessenden nor Chapel Hill-Chauncy Hall qualifies as a special school does not indicate that a medical deduction for payments to these schools is entirely foreclosed. If David received medical care at these institutions, then petitioners are entitled to deduct the payments to the institutions for the cost of such medical care. Fischer v. Commissioner, supra, 50 T.C. at 175-176; Lichterman v. Commissioner, supra, 37 T.C. at 597-598; Hendrick v. Commissioner, 35 T.C. 1223, 1237-1238. Cf. section 1.213-1(e)(v)(b), Income Tax Regs. *52 , supra note 3.The respondent has conceded on brief that expenditures of $5.74 for infirmary and dispensary services at Fessenden School and of $500 for psychiatric counselling at Chapel Hill-Chauncy Hall are expenditures for medical care. However, there remains in dispute whether payments for Dr. Clampit's services at Fessenden and payments of learning center charges at both schools were expenditures for "medical care".
The statute defines "medical care" to include services involving the diagnosis, mitigation, or treatment of disease, and procedures affecting bodily structure or function. [6] The legislative history [7] and the regulations [8] make it clear that expenditures for the alleviation of mental, as well as physical, defects or illnesses are to be deductible. To qualify a particular expenditure for a medical deduction, petitioners must show that David was afflicted with a mental disease, defect, or illness, and that the services received directly or proximately related to the mitigation or treatment of the disease or defect. See Jacobs v. Commissioner, 62 T.C. 813, 818-819 (1974). *53 We conclude that payments to Fessenden for Dr. Clampit's services may properly be classified as medical expenses. Payments for the services of psychologists have long been recognized by the Commissioner as payments for medical care. See Rev. Rul. 63-91, 1963-1 C.B. 54; Rev. Rul. 55-261, 1655-1 C.B. 307; Rev. Rul. 143, 1953-2 C.B. 129. This Court has allowed deductions based on payments to schools for the services of child psychologists in several cases, and we see no reason for a different result here. See Greisdorf v. Commissioner, supra, 54 T.C. at 1687-1691; Fischer v. Commissioner, supra, 50 T.C. at 174-175; Hendrick v. Commissioner, supra, 35 T.C. at 1237. Although there are some indications in the record that the charges for Dr. Clampit's services were charges for testing and not regular counselling, we are satisfied that in the *54 circumstances such testing may properly be classified as diagnostic in respect of a medical disease or defect. See section 213(e)(1)(A), I.R.C. 1954, supra note 2. Accordingly, petitioners may treat as a medical expense their $108 payments to Fessenden for Dr. Clampit's services. We hold further that petitioners' expenditures for learning center fees also qualify as medical expenses. Although the record does not contain a precise characterization of David's condition in medical terminology, there is ample evidence to support a finding that he suffered from some sort of learning disability, accompanied by emotional or psychiatric problems, and we conclude that David had a mental disease or defect within the meaning of the statute and regulations. Furthermore, we find the required proximate relation between the services received in the learning center and the alleviation of David's learning defect. The activities at the learning centers of both schools were designed to diagnose the specific learning defect David had and to design a program through which he could learn. The learning centers at both schools were staffed by persons specially trained to *55 deal with learning disabilities. The mere fact that these persons were not medical doctors does not mean that their services may not be considered "medical care" under the statute.The therapeutic nature of the services performed, not the title of the individual performing the services, determines whether the services qualify as "medical care". Brown v. Commissioner, supra, 62 T.C. at 554; Fischer v. Commissioner, supra, 50 T.C. at 174; Wendell v. Commissioner, 12 T.C. 161, 163 (1949); Rev. Rul. 63-91, 1963-1 C.B. 54. We find no basis for distinguishing between learning disabilities and other mental or physical dysfunctions which require the afflicted individual to receive special training in order to function normally. Certainly, special training and instruction for a child who is mentally retarded or deaf would be regarded as a medical expense. Rev. Rul. 58-280, 1958-1 C.B. 157, 158; Rev. Rul. 55-261, 1955-1 C.B. 307, 309. Cf. section 1.213-1(e)(v)(a), Income Tax Regs. *56 , supra note 3. Although David perhaps faced less severe problems in learning, he still suffered from a mental defect which impaired his ability to learn, and which required special treatment. We hold that the treatment of David's learning disabilities by the learning centers at Fessenden and Chapel Hill-Chauncy Hall qualified as "medical care". Cf. Fischer v. Commissioner, supra, 50 T.C. at 173-175; Rev. Rul. 78-340, 78-2 C.B. 124; Rev. Rul. 69-607, 1969-2 C.B. 40. The record as to the learning center at Fessenden is not entirely satisfactory. The school has made some changes in its learning center since the time David was a student at Fessenden, and the testimony of Mr. Robert Coffin, headmaster of Fessenden, was not always clear as to whether he was describing the learning center as structured at the time of trial or at the time David was a student there in 1975. On direct examination, Mr. Coffin testified that the learning center in 1975 had "more of a tutorial type of function" than it does at the present time. Also, he stated several times that the learning center provided "academic tutoring" or "concentrated tutoring". *57 Accordingly, the respondlent contends that the services David received from the learning center at Fessenden were merely "tutoring", and that such services cannot qualify as medical expenses. Although the evidence is subject to conflicting interpretations, we do not agree with the respondent. First of all, the mere characterization of a service as "tutoring" does not mean that the service cannot be "medical" in nature. The Commissioner has used the same word in holding that payments for "tutoring" of a child with learning disabilities may qualify as a medical expense if the teacher is specifically trained to educate children with learning disabilities and if the "tutoring" was recommended by the child's physician. Rev. Rul. 78-340, 1978-2 C.B. 124, 125.Cf. Rev. Rul. 69-607, 1969-2 C.B. 40. Regardless of what a service is called by laymen, it qualifies as a medical expense if it meets the requirements of the statute. Secondly, we do not find any major change in the services of the learning center from 1975 to the present. Mr. Coffin, whose graduate degree is in English, characterized the present learning center services as "concentrated tutoring". If *58 he so describes the present services of the learning center, we fail to see his description of the learning center in 1975 as "more of a tutorial type of function" as an indication of a marked change in the activities of the learning center. Mr. Coffin frankly conceded that he did not fully understand all the manifestations of learning disabilities, and we do not find his characterization of the learning center services as "academic tutoring", or his descriptions of a change in the function of the learning center, to be dispositive of the case. It is clear that David received assistance from Maria Orlow, who was the head of the learning center in 1975. Before David was admitted to Fessenden, school officials were informed that he had "learning problems". In spite of this, school officials believed that Fessenden had sufficient resources to deal with these problems, utilizing the services of Ms. Orlow and other "tutors" at the learning center. Thus, from the time David enrolled at Fessenden, the learning center was utilized to deal with his learning disabilities.We find this fact to be of greater weight than Mr. Coffin's characterizations of the services provided by the learning *59 center.Finally, we find it significant that the services of the learning center were viewed by the school as sufficiently separate from the school's regular educational program that extra charges were made for the services. Although Fessenden teachers were available every afternoon to help students having difficulties in their class, there was no charge for this service. David received individual instruction in mathematics for several months, and there is no indication that there was an extra charge for this service. Thus, although the record is not as definite as might be desired, we find sufficient evidence that the charges for "tutoring" paid to Fessenden were for special services to assist David in overcoming his learning disability and qualify as medical expenses under the circumstances. Hence, the $1,052 payments petitioners made for special training given to David in the learning center at Fessenden qualify as medical expenses. Learning center charges at Chapel Hill-Chauncy Hall were billed at the rate of $200 per term. However, only one such charge was billed to petitioners during 1975. Although $20 was paid to Chapel Hill-Chauncy Hall after the date of the learning *60 center charge, this payment was applied only to reduce the balance due the school, which consisted of charges for a number of other services aside from the learning center. The account was not fully paid until 1976. Accordingly, since petitioners have not shown that they paid charges for the learning center at Chapel Hill-Chauncy Hall in 1975, they may not be taken into account as medical expenses for that year. Decicison will be entered under Rule 155. Footnotes
1. The total deduction claimed (apart from the medical insurance premium) was $4,738, which represented the excess of claimed medical expenses ($6,229.18) over three percent of petitioner's reported adjusted gross income ($1,491.18). In addition to the school expenses, the total medical expenses included other items aggregating $435.76, but the Commissioner disapproved only the inclusion of the school expenses in the computation of the medical deduction.↩
2. SEC. 213. MEDICAL, DENTAL, ETC., EXPENSES. (a) Allowance of Deduction.--There shall be allowed as a deduction the following amounts, not compensated for by insurance or otherwise-- (1) the amount by which the amount of the expenses paid during the taxable year (reduced by any amount deductible under paragraph (2)) for medical care of the taxpayer, his spouse, and dependents (as defined in section 152) exceeds 3 percent of the adjusted gross income * * * * * *
(e) Definitions.--For purposes of this section-- (1) The term "medical care" means amounts paid-- (A) for the diagnosis, cure, mitigation, treatment, or prevention of disease, or for the purpose of affecting any structure or function of the body. (B) for transportation primarily for and essential to medical care referred to in subparagraph (A) * * * ↩
3. Sec. 1.213-1(e), Income Tax Regs., provides in part as follows: (e) Definitions--(1) General. (i) The term "medical care" includes the diagnosis, cure, mitigation, treatment, or prevention of disease. Expenses paid for "medical care" shall include those paid for the purpose of affecting any structure or function of the body or for transportation primarily for and essential to medical care. * * * (ii) Amounts paid for operations or treatments affecting any portion of the body, including obstetrical expenses and expenses of therapy or X-ray treatments, are deemed to be for the purpose of affecting any structure or function of the body and are therefore paid for medical care. * * * Deductions for expenditures for medical care allowable under section 213 will be confined strictly to expenses incurred primarily for the prevention or alleviation of a physical or mental defect or illness. Thus, payments for the following are payments for medical care: Hospital services, nursing services (including nurses' board where paid by the taxpayer), medical, laboratory, surgical, dental and other diagnostic and healing services, X-rays, medicine and drugs, * * * artificial teeth or limbs, is merely beneficial to the general health of an individual, such as an expenditure for a vacation, is not an expenditure for medical care. * * *
(iv) Expenses paid for transportation primarily for and essential to the rendition of the medical care are expenses paid for medical care. However, an amount allowable as a deduction for "transportation primarily for and essential to medical care" shall not include the cost of any meals and lodging while away from home receiving medical treatment. For example, if a doctor prescribes that a taxpayer go to a warm climate in order to alleviate a specific chronic ailment, the cost of meals and lodging while there would not be deductible. On the other hand, if the travel is undertaken merely for the general improvement of a taxpayer's health, neither the cost of transportation nor the cost of meals and lodging would be deductible. If a doctor prescribes an operation or other medical care, and the taxpayer chooses for purely personal considerations to travel to another locality (such as a resort area) for the operation or the other medical care, neither the cost of transportation nor the cost of meals and lodging (except where paid as part of a hospital bill) is deductible. (v) The cost of in-patient hospital care (including the cost of meals and lodging therein) is an expenditure for medical care. The extent to which expenses for care in an institution other than a hospital shall constitute medical care is primarily a question of fact which depends upon the condition of the individual and the nature of the services he receives (rather than the nature of the institution). A private establishment which is regularly engaged in providing the types of care or services outlined in this subdivision shall be considered an institution for purposes of the rules provided herein. In general, the following rules will be applied: (a) Where an individual is in an institution because his condition is such that the availability of medical care (as defined in subdivisions (i) and (ii) of this subparagraph) in such institution is a principal reason for his presence there, and meals and lodging are furnished as a necessary incident to such care, the entire cost of medical care and meals and lodging at the institution, which are furnished while the individual requires continual medical care, shall constitute an expense for medical care. For example, medical care includes the entire cost of institutional care for a person who is mentally ill and unsafe when left alone. While ordinary education is not medical care, the cost of medical care includes the cost of attending a special school for a mentally or physically handicapped individual, if his condition is such that the resources of the institution for alleviating such mental or physical handicap are a principal reason for his presence there. In such a case, the cost of attending such a special school will include the cost of meals and lodging, if supplied, and the cost of ordinary education furnished which is incidental to the special services furnished by the school.Thus, the cost of medical care includes the cost of attending a special school designed to compensate for or overcome a physical handicap, in order to qualify the individual for future normal education or for normal living, such as a school for the teaching of braille or lip reading. Similarly, the cost of care and supervision, or of treatment and training, of a mentally retarded or physically handicapped individual at an institution is within the meaning of the term "medical care". (Emphasis supplied.) (b) Where an individual is in an institution, and his condition is such that the availability of medical care in such institution is not a principal reason for his presence there, only that part of the cost of care in the institution as is attributable to medical care (as defined in subdivisions (i) and (ii) of this subparagraph) shall be considered as a cost of medical care; meals and lodging at the institution in such a case are not considered a cost of medical care for purposes of this section. For example,e, an individual is in a home for the aged for personal or family considerations and not because he requires medical or nursing attention. In such case, medical care consists only of that part of the cost for care in the home which is attributable to medical care or nursing attention furnished to him; his meals and lodging at the home are not considered a cost of medical care. (c) It is immaterial for purposes of this subdivision whether the medical care is furnished in a Federal or State institution or in a private institution. (vi) See section 262↩ and the regulations thereunder for disallowance of deduction for personal, living, and family expenses not falling within the definition of medical care.
4. The respondent would allow only $500 as a deduction for psychological services; the $108 paid for Dr. Clampit's services at Fessenden is viewed by respondent as a payment for testing services, not psychological counselling. The respondent concedes that the payment of $5.74 to Fessenden for infirmary and dispensary services is deductible as a medical expense.↩
5. It might be argued that if the medical services offered by a private school are a principal reason for the student's presence there, then "the cost of meals and lodging, if supplied, and the cost of ordinary education furnished which is incidental to the special services furnished by the school" may be allowable as a medical deduction. Sec. 1.213-1(e)(v)(a), Income Tax Regs., supra note 3. In other words, it might be suggested that meals and lodging may be deducted if the "principal reason" test is met, regardless of whether the educational services received are merely incidental to the provision of special services. However, although such a reading of the regulations is plausible, it is clearly inconsistent with the results in several cases. Fischer, Hendrick, and Estate of Baer all found as a fact that a principal reason that the taxpayers incurred private school expenses was that special medical services were available at the schools. Sischer v. Commissioner, 50 T.C. 164, 170 (1968); Hendrick v. Commissioner, 35 T.C. 1223, 1236-1237 (1961); Estate of Baer v. Commissioner, 26 T.C.M. 170, 173, 36 P-H Memo. T.C. par. 67,034, at 185, 188. None theless, in each of these cases, the Court made no allowance for a deduction for expenses of meals and lodging. In fact, in Estate of Baer, the Court explicitly denied a deduction for meals and lodging expense incurred while attending a school which provided special services to a handicapped child. Estate of Baer v. Commissioner, supra, 26 T.C.M. at 173, 36 P-H Memo T.C. at 188. Thus, it appears that the quoted sentence in the regulations should be read merely to define the principal attribute of a special school, namely, that it renders educational services only as an incident to performing special services. See Fischer v. Commissioner, supra, 50 T.C. at 175. Such a reading of the regulations would also be in accord with the general Congressional policy to limit rather strictly the deduction of meals and lodging expenses incurred while receiving medical care. See generally sec. 1.213-1(e)(iv), Income Tax Regs., supra note 3; H. Rept. No. 1337, 83d Cong., 2d Sess. A60 (1954); S. Rept. No. 1622, 83d Cong., 2d Sess. 219-220 (1954); Commissioner v. Bilder, 369 U.S. 499, 501-504↩ (1962).
6. See sec. 213(e)(1)(A), I.R.C. 1954, supra↩ note 2. 7. See S. Rept. No. 1631, 77th Cong., 2d Sess. 95-96 (1942). ↩
8. See sec. 1.213-1(e)(ii), Income Tax Regs., supra↩ note 3.